[No. S163681. July 26, 2010.]

COUNTY OF SANTA CLARA et al., Petitioners, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
ATLANTIC RICHFIELD COMPANY et al., Real Parties in Interest.

## COUNSEL

Ann Miller Ravel and Miguel Marquez, County Counsel (Santa Clara), Cheryl A. Stevens, Aryn P. Harris, Winifred Botha, Orry Korb, Tamara Lange and Anne O. Decker, Deputy County Counsel; Dennis J. Herrera, City Attorney (San Francisco), Owen J. Clements, Chief of Special Litigation, Danny Chou and Erin Bernstein, Deputy City Attorneys; Michael J. Aguirre and Jan Goldsmith, City Attorneys (San Diego), Sim von Kalinowski, Chief Deputy City Attorney, Daniel F. Bamberg, Deputy City Attorney; Richard E. Winnie, County Counsel (Alameda), Raymond L. MacKay and Andrea L. Weddle, Deputy County Counsel; Dennis Bunting, County Counsel (Solano); Thomas F. Casey III and Michael P. Murphy, County Counsel (San Mateo), Brenda Carlson, Chief Deputy County Counsel, Rebecca M. Archer, Deputy County Counsel; Raymond G. Fortner, Jr., and Andrea Sheridan Ordin, County Counsel (Los Angeles), Donovan M. Main, Richard K. Mason and Robert E. Ragland, Deputy County Counsel; Rockard J. Delgadillo, City Attorney (Los Angeles), Jeffrey B. Isaacs, Chief of Criminal and Special Litigation, Patricia Bilgin and Elise Ruden, Deputy City Attorneys; John A. Russo, City Attorney (Oakland), Christopher Kee, Deputy City Attorney; Charles J. McKee, County Counsel (Monterey), William M. Litt, Deputy County Counsel; Cotchett, Pitre & McCarthy, Frank M. Pitre, Nancy L. Fineman, Ara Jabagchourian, Douglas Y. Park; Thornton & Naumes, Michael P. Thornton, Neil T. Leifer; Motley Rice, Fidelma Fitzpatrick, Aileen Sprague; Mary Alexander & Associates, Mary Alexander and Jennifer L. Fiore for Petitioners.

Arthur H. Bryant and Victoria W. Ni for Public Justice, P.C., as Amicus Curiae on behalf of Petitioners.

Genevieve M. Allaire Johnson, Special Assistant Attorney General; Hagens Berman Sobol Shapiro and Jeff D. Friedman for State of Rhode Island as Amicus Curiae on behalf of Petitioners.

Jennifer B. Henning for California State Association of Counties and League of California Cities as Amici Curiae on behalf of Petitioners.

Waters Kraus & Paul, Ingrid M. Evans, David L. Cheng; Waters Kraus, Charles S. Siegel and Loren Jacobson for Healthy Children Organizing Project, Western Center on Law and Poverty, Inner City Law Center, Public Advocates, Inc., Public Health Institute, Law Foundation of Silicon Valley, California Conference of Local Health Officers, Prevention Institute, Alliance for Healthy Homes, American Academy of Pediatrics, California Center for Public Health Advocacy, Equal Justice Society and Worksafe Law Center as Amici Curiae on behalf of Petitioners.

Rosen, Bien & Galvan, Sanford Jay Rosen, Kenneth M. Walczak, Elizabeth H. Eng; Law Offices of Richard M. Pearl and Richard M. Pearl for Legal Ethics Professors Erwin Chemerinsky, Stephen Gillers, Nathaniel E. Gozansky, Matthew I. Hall, Carol M. Langford, Deborah L. Rhode, Mark L. Tuft and W. Bradley Wendel as Amici Curiae on behalf of Petitioners.

Gardere Wynne Sewell, Richard O. Faulk, John S. Gray; Steptoe & Johnson and Jay E. Smith for Public Nuisance Fairness Coalition, American Chemistry Council, Property Casualty Insurers Association of America and National Association of Manufacturers as Amici Curiae on behalf of Petitioners.

Sher Leff and Victor M. Sher for Association of California Water Agencies as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Arnold & Porter, Ronald C. Redcay, Sean Morris, Eric May, Shane W. Tseng, John R. Lawless, Kristen L. Roberts, Philip H. Curtis and William H. Voth for Real Party in Interest Atlantic Richfield Company.

Horvitz & Levy, David M. Axelrad and Lisa Perrochet for Real Party in Interest Millennium Inorganic Chemicals, Inc.

Orrick, Herrington & Sutcliffe, Richard W. Mark, Elyse D. Echtman; Filice Brown Eassa & McLeod, Peter A. Strotz, William E. Steimle and Daniel J. Nichols for Real Party in Interest American Cyanamid Company.

Greve, Clifford, Wengel & Paras, Lawrence A. Wengel, Bradley W. Kragel; Ruby & Schofield, Law Office of Allen Ruby, Allen J. Ruby, Glen W. Schofield; McGrath, North, Mullin & Kratz, James P. Fitzgerald and James J. Frost for Real Party in Interest ConAgra Grocery Products Company.

McGuire Woods, Steven R. Williams, Collin J. Hite; Glynn & Finley, Clement L. Glynn and Patricia L. Bonheyo for Real Party in Interest E. I. du Pont de Nemours and Company.

Halleland, Lewis, Nilan & Johnson, Michael T. Nilan; Ropers, Majeski, Kohn & Bentley and James C. Hyde for Real Party in Interest Millennium Holdings LLP.

Crowley, Barrett & Karaba, Paul F. Markoff; Robinson & Wood and Archie S. Robinson for Real Party in Interest the O'Brien Corporation.

Timothy Hardy; McManis, Faulkner & Morgan, McManis Faulkner, James H. McManis, William W. Faulkner, Matthew Schechter; Bartlit, Beck, Herman, Palenchar & Scott and Donald T. Scott for Real Party in Interest NL Industries, Inc.

Jones Day, John W. Edwards II, Elwood Lui, Brian J. O'Neill, Frederick D. Friedman, Paul M. Pohl, Charles H. Moellenberg, Jr., and Leon F. DeJulius, Jr., for Real Party in Interest the Sherwin-Williams Company.

Elizabeth Milito; Carlton DiSante & Freudenberger and Nancy G. Berner for National Federation of Independent Business Small Business Legal Center as Amicus Curiae on behalf of Real Party in Interest Atlantic Richfield Company.

Shook, Hardy & Bacon, Kevin Underhill, Victor E. Schwartz, Cary Silverman; National Chamber Litigation Center, Inc., Robin S. Conrad, Amar Sarwal; and Sherman Joyce for Chamber of Commerce of the United States of America and the American Tort Reform Association as Amici Curiae on behalf of Real Party in Interest Atlantic Richfield Company.

Latham & Watkins and Paul N. Singarella for Orange County Business Council as Amicus Curiae on behalf of Real Party in Interest Atlantic Richfield Company.

Thomas J. Graves; Spriggs & Hollingsworth, Eric G. Lasker and Marc S. Mayerson for National Paint & Coatings Association, Inc., as Amicus Curiae on behalf of Real Parties in Interest.

Fred J. Hiestand for the Civil Justice Association of California as Amicus Curiae on behalf of Real Parties in Interest.

Ronald D. Rotunda; Akin Gump Strauss Hauer & Feld, Rex S. Heinke and Jessica M. Weisel for National Organization of African Americans in Housing as Amicus Curiae on behalf of Real Parties in Interest.

Maureen Martin for The Heartland Institute as Amicus Curiae on behalf of Real Parties in Interest.

Hugh F. Young, Jr.; Dechert, James M. Beck; Drinker Biddle & Reath and Alan J. Lazarus for the Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Real Parties in Interest.

W. Scott Thorpe for California District Attorneys Association as Amicus Curiae.

Coughlin Stoia Geller Rudman & Robbins, Timothy G. Blood, Pamela M. Parker; Eugene G. Iredale; Law Offices of Arthur F. Tait III & Associates, Arthur F. Tait III; Sullivan, Hill, Lewin, Rez & Engel, Brian L. Burchett; Wingert Grebing Brubaker & Goodwin, Charles R. Grebing, Eric R. Deitz; Michael Fremont Law Office and Michael J. Fremont for C.L. Trustees, Patricia Yates, Christine Stankus, Jerrold Cook, Richard Yells, Mark L. Glickman, Heather Buys and Christine Ballon as Amici Curiae.

## OPINION

**GEORGE, C. J.**—A group of public entities composed of various California counties and cities (collectively referred to as the public entities) are prosecuting a public-nuisance action against numerous businesses that manufactured lead paint (collectively referred to as defendants). The public entities are represented both by their own government attorneys and by several private law firms. The private law firms are retained by the public entities on a contingent-fee basis. After summary judgment was granted in favor of defendants on various tort causes of action initially advanced by the public entities, the complaint eventually was amended to leave the public-nuisance action as the sole claim, and abatement as the sole remedy.

Defendants moved to bar the public entities from compensating their privately retained counsel by means of contingent fees. The superior court, relying upon this court's decision in *People ex rel. Clancy v. Superior Court* (1985) 39 Cal.3d 740 [218 Cal.Rptr. 24, 705 P.2d 347] (*Clancy*), ordered the public entities barred from compensating their private counsel by means of any contingent-fee agreement, reasoning that under *Clancy*, all attorneys prosecuting public-nuisance actions must be "absolutely neutral." The superior court concluded that *Clancy* therefore precluded any arrangement in which private counsel has a financial stake in the outcome of a case brought on behalf of the public. On petition of the public entities seeking a writ of mandate, the Court of Appeal held that *Clancy* does not bar *all* contingent-fee agreements with private counsel in public-nuisance-abatement actions, but only those in which private attorneys appear *in place of*, rather than *with and under the supervision of*, government attorneys.

We must decide whether the Court of Appeal correctly construed our opinion in *Clancy,* or if that case instead broadly prohibits all contingent-fee agreements between public entities and private counsel in any public-nuisance action prosecuted on behalf of the public. *Clancy* arguably supports defendants' position favoring a bright-line rule barring any attorney with a financial interest in the outcome of a case from representing the interests of the public in a public-nuisance-abatement action. As set forth below, however, a reexamination of our opinion in *Clancy* suggests that our decision in

that case should be narrowed, in recognition of both (1) the wide array of public-nuisance actions (and the corresponding diversity in the types of interests implicated by various prosecutions), and (2) the different means by which prosecutorial duties may be delegated to private attorneys without compromising either the integrity of the prosecution or the public's faith in the judicial process.

## I

The procedural history of this case is not in dispute. The public entities' claims against defendants originally included causes of action for fraud, strict liability, negligence, unfair business practices, and public nuisance.[1] (*County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 300 [40 Cal.Rptr.3d 313] (*Santa Clara*).) The superior court granted defendants' motion for summary judgment on all causes of action. The Court of Appeal reversed the superior court's judgment of dismissal and ordered the lower court to reinstate the public-nuisance, negligence, strict liability, and fraud causes of action. (*Id.* at p. 333.) Thereafter, the public entities filed a fourth amended complaint that alleged a single cause of action, for public nuisance, and sought only abatement. Throughout this litigation, the public entities have been represented both by their government counsel and by private counsel.

Upon remand following *Santa Clara*, *supra*, 137 Cal.App.4th 292, defendants filed a "motion to bar payment of contingent fees to private attorneys," asserting that "the government cannot retain a private attorney on a contingent fee basis to litigate a public nuisance claim." Defendants sought "an order that precludes plaintiffs from retaining outside counsel under any agreement in which payment of fees and costs is contingent on the outcome of the litigation."

Defendants attached to their motion a number of fee agreements between the public entities and their private counsel, and the public entities filed opposition to which they attached their fee agreements and declarations of their government attorneys and private counsel. The fee agreements and declarations disclose that the public entities and private counsel agreed that,

---

[1] The plaintiffs in this case are County of Santa Clara (Santa Clara), County of San Mateo (San Mateo), County of Monterey (Monterey), County of Solano (Solano), County of Los Angeles, County of Alameda (Alameda), City and County of San Francisco (San Francisco), City of Oakland (Oakland), City of Los Angeles, and City of San Diego (San Diego).

As a result of corporate acquisition and merger, the names of the defendants in the action below are Atlantic Richfield Company, Millennium Inorganic Chemicals, Inc., Millennium Holdings LLC, American Cyanamid Company, ConAgra Grocery Products Company, E. I. du Pont de Nemours and Company, NL Industries, Inc., Sherwin-Williams Company, The O'Brien Corporation, and Does Nos. 1 to 50, inclusive.

other than $150,000 that would be forwarded by Santa Clara to cover initial costs, private counsel would incur all further costs and would not receive any legal fees unless the action were successful. If the action succeeded, private counsel would be entitled to recover any unreimbursed costs from the "recovery" and a fee of 17 percent of the "net recovery."

Some of the contingent-fee agreements in the present case specify the respective authority of both private counsel and public counsel to control the conduct of the pending litigation. The fee agreements between private counsel and San Francisco, Santa Clara, Alameda, Monterey, and San Diego explicitly provide that the public entities' government counsel "retain final authority over all aspects of the Litigation."[2] Private counsel for those five public entities submitted declarations confirming that their clients' government counsel retain "complete control" over the litigation.[3] The two remaining fee agreements contained in the record—those involving Solano and Oakland—purport to grant private counsel "absolute discretion in the decision of who to sue and who not to sue, if anyone, and what theories to plead and what evidence to present." During proceedings in the trial court, Oakland disclaimed this fee agreement and asserted that its government counsel had retained "complete control" of the litigation and intended to revise the agreement to reflect this circumstance.[4] Solano's private counsel asserts that its public counsel have "maintained and continue to maintain complete control over all aspects of the litigation" and "all decision making authority

---

[2] Four of these five public entities submitted declarations of government counsel stating that they had "retained and continue[d] to retain complete control of the litigation," were "actively involved in and direct[ed] all decisions related to the litigation," and have "direct oversight over the work of outside counsel." San Francisco's submission declared that "[t]he San Francisco City Attorney's Office has in fact retained control over all significant decisions" in this case.

[3] Private counsel Cotchett, Pitre & McCarthy submitted a declaration in which it stated it had been retained by Santa Clara, Solano, Alameda, Oakland, Monterey, San Mateo, and San Diego. This law firm asserted that these public entities' government counsel "have maintained and continue to maintain complete control over all aspects of the litigation" and "all decision making authority and responsibility." Private counsel Thornton & Naumes, private counsel Motley Rice, and private counsel Mary E. Alexander submitted declarations asserting that they had been retained by San Francisco to assist in this litigation, and that San Francisco's city attorney "has retained complete control over this litigation" and has "exercised full decision-making authority and responsibility."

[4] Oakland submitted a declaration by one of its deputy city attorneys stating that "Notwithstanding any documents suggesting the contrary, the Office of the City Attorney has retained complete control over the prosecution of the public nuisance cause of action in this case as it relates to the interests of the People of the City of Oakland." Oakland asserted it was "in the process of revising" its fee agreement "so that it reflects the reality of the relationship" between Oakland and its private counsel.

and responsibility." The record before us does not contain the fee agreements between the three other public-entity petitioners and their respective private counsel.[5]

The various fee agreements provide different definitions of "recovery." Some of the agreements define the term "recovery" as "moneys other than civil penalties," whereas others define this term as the "amount recovered, by way of judgment, settlement, or other resolution." Some of the agreements include the phrase "both monetary and non-monetary" in their definitions of "recovery." The San Diego agreement defines "net recovery" as "the payment of money, stock, and/or . . . the value of the abatement remedy after the deduction of the costs paid or to be paid." The Santa Clara fee agreement provides that, "[i]n the event that the Litigation is resolved by settlement under terms involving the provision of goods, services or any other 'in-kind' payment, the Santa Clara County Counsel agrees to seek, as part of any such settlement, a mutually agreeable monetary settlement of attorneys' fees and expenses."

In April 2007, the superior court heard defendants' motion "to bar payment" as well as the public entities' motion for leave to file a fourth amended complaint. The court granted the public entities' motion and ordered that the pleading be filed within 30 days.

Although some preliminary issues were raised concerning the ripeness of defendants' motion, the superior court resolved the motion on its merits. The court rejected the public entities' claim that *Clancy, supra,* 39 Cal.3d 740, was distinguishable, concluding instead that under *Clancy,* "outside counsel must be precluded from operating under a contingent fee agreement, regardless of the government attorneys' and outside attorneys' well-meaning intentions to have all decisions in this litigation made by the government attorneys." The court granted defendants' motion and entered an order "preclud[ing] Plaintiffs from retaining outside counsel under any agreement in which the payment of fees and costs is contingent on the outcome of the litigation . . . ." But the court allowed the public entities "30 days to file with the court new fee agreements" or "declarations detailing the fee arrangements with outside counsel."

---

[5] Seven separate fee agreements between the various public entities and their private counsel were before the lower courts and are part of the record before this court. These fee agreements are between private counsel and Santa Clara, Monterey, San Francisco, Solano, Oakland, Alameda, and San Diego. The record does not contain the fee agreements between private counsel and San Mateo, County of Los Angeles, and City of Los Angeles, respectively, although these three entities are and remain plaintiffs in the underlying case and petitioners here.

The public entities sought a writ of mandate in the Court of Appeal. After issuing an order to show cause, the appellate court ultimately set aside the superior court's ruling and issued a writ commanding the lower court to (1) set aside its order granting defendants' motion, and (2) enter a new order denying defendants' motion. Although acknowledging that *Clancy* purported to bar the participation of private counsel on a contingent-fee basis in public-nuisance-abatement lawsuits brought in the name of a public entity, the Court of Appeal held that the rule set forth in *Clancy* is not categorical and does not bar the fee agreements made in the present case, because those agreements specified that the government attorneys would maintain full control over the litigation. The appellate court, briefly noting that the suit being prosecuted did not seek to impose criminal liability or infringe upon fundamental constitutional rights, reasoned that the circumstance that the private attorneys are being supervised by public lawyers vitiates any concern regarding the neutrality of outside counsel. We granted defendants' petition for review.

## II

### A

We begin our inquiry with this court's decision in *Clancy*. In that case, the City of Corona (Corona) hired James Clancy, a private attorney, to bring nuisance abatement actions against a business (the Book Store), which sold adult materials. (*Clancy, supra*, 39 Cal.3d at p. 743.) The hiring of Clancy followed several attempts by Corona to terminate the operations of this establishment. Specifically, several months after the Book Store opened, Corona adopted two ordinances that purported to regulate adult bookstores, one defining "sex oriented material" and the other restricting the sale of such material to certain zones in Corona. (*Ibid.*) After the owner of the Book Store, Helen Ebel, filed an action in federal court, the United States Court of Appeals for the Ninth Circuit ultimately held both ordinances to be unconstitutional. (*Ebel v. City of Corona* (9th Cir. 1985) 767 F.2d 635.)

Corona subsequently retained the services of Clancy to abate nuisances under the authority of a new ordinance, proposed on the same day Clancy was hired and seemingly targeted specifically at the Book Store. (*Clancy, supra*, 39 Cal.3d at p. 743.) The ordinance defined a public nuisance as " '[a]ny and every place of business in the City . . . in which obscene publications constitute all of the stock in trade, or a principal part thereof . . . .' " (*Ibid.*) The employment contract between Corona and Clancy, who was an independent contractor rather than an employee (*id.* at p. 747), provided that he was to be paid $60 per hour for his work in bringing public-nuisance actions, except that he would be paid only $30 per hour for his work in any

public-nuisance action in which Corona did not prevail or in which Corona prevailed but did not recover attorney fees. (*Id.* at p. 745.)

Two weeks after the public-nuisance ordinance was enacted, Corona passed a resolution declaring the Book Store to be a public nuisance and revoking its business license. Thereafter, Corona and Clancy (as the city's " 'special attorney' ") filed a complaint against Ebel, her son Thomas Ebel, another individual, and the Book Store, seeking abatement of a public nuisance, declaratory judgment, and an injunction. (*Clancy, supra,* 39 Cal.3d at p. 744.)[6] The Ebels unsuccessfully attempted to disqualify Clancy as the attorney for Corona. (*Clancy,* at p. 744.) The Ebels then sought writ relief, contending it was "improper for an attorney representing the government to have a financial stake in the outcome of an action to abate a public nuisance," and asserting that "a government attorney prosecuting such actions must be neutral, as must an attorney prosecuting a criminal case." (*Id.* at p. 745.) This court generally agreed, finding the arrangement between Corona and Clancy "inappropriate under the circumstances." (*Id.* at p. 743.)

We observe as a threshold matter that our decision to disqualify Clancy from representing Corona in the public-nuisance action was founded not upon any specific statutory provision or rule governing the conduct of attorneys, but rather upon the courts' general authority "to disqualify counsel when necessary in the furtherance of justice." (*Clancy, supra,* 39 Cal.3d at p. 745.) Invoking that authority, this court stated that it "may order that Clancy be dismissed from the case if we find the contingent fee arrangement prejudices the Ebels." (*Ibid.*)

We concluded that for purposes of evaluating the propriety of a contingent-fee agreement between a public entity and a private attorney, the neutrality rules applicable to criminal prosecutors were equally applicable to government attorneys prosecuting certain civil cases. (*Clancy, supra,* 39 Cal.3d at pp. 746–747.) Accordingly, our decision set forth the responsibilities associated with the prosecution of a criminal case, noting that a prosecutor does not represent merely an ordinary party to a controversy, but instead is the representative of a " ' "sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." ' " (*Clancy, supra,* 39 Cal.3d at p. 746; see *People v. Superior Court (Greer)* (1977) 19 Cal.3d 255, 266 [137 Cal.Rptr. 476, 561 P.2d 1164] (*Greer*).) We noted that a prosecutor's duty of neutrality stems from two

---

[6] During proceedings instituted to quash a subpoena issued after the filing of the lawsuit, the court allowed Corona to amend its complaint to substitute the term "City Attorney of Corona" as Clancy's title. (*Clancy, supra,* 39 Cal.3d at p. 744.) Clancy appeared in the action in place of, and with no supervision by, Corona's city attorney.

fundamental aspects of his or her employment. As a representative of the government, a prosecutor must act with the impartiality required of those who govern. Moreover, because a prosecutor has as a resource the vast power of the government, he or she must refrain from abusing that power by failing to act evenhandedly. (*Clancy, supra*, 39 Cal.3d at p. 746.) With these principles in mind, we declared that not only is a government lawyer's neutrality "essential to a fair outcome for the litigants in the case in which he is involved, it is essential to the proper function of the judicial process as a whole." (*Ibid.*)

Recognizing that a city attorney is a public official, we noted that "the rigorous ethical duties imposed on a criminal prosecutor also apply to government lawyers generally." (*Clancy, supra*, 39 Cal.3d at p. 748.) Thus, pursuant to the American Bar Association's then Model Code of Professional Responsibility, a lawyer who is a public officer " 'should not engage in activities in which his personal or professional interests are or foreseeably may be in conflict with his official duties.' " (*Clancy, supra*, 39 Cal.3d at p. 747, quoting former ABA Model Code Prof. Responsibility, EC 8-8.) " '[An] attorney holding public office should avoid all conduct which might lead the layman to conclude that the attorney is utilizing his public position to further his professional success or personal interests.' " (*Clancy, supra*, 30 Cal.3d at p. 747, quoting ABA Com. on Prof. Ethics, opn. No. 192 (1939).) Notably, we held that because public lawyers handling noncriminal matters are subject to the same ethical conflict-of-interest rules applicable to public prosecutors, "there is a class of civil actions that demands the representative of the government to be absolutely neutral. This requirement precludes the use in such cases of a contingent fee arrangement." (*Clancy, supra*, 39 Cal.3d at p. 748.)

We further held that public-nuisance-abatement actions belong to the class of civil cases in which counsel representing the government must be absolutely neutral. (*Clancy, supra*, 39 Cal.3d at p. 749.) We came to this conclusion by analogizing a public-nuisance-abatement action to an eminent domain action—a type of proceeding in which we already had concluded that government attorneys must be unaffected by personal interest. (*Id.* at p. 748, citing *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871 [135 Cal.Rptr. 647, 558 P.2d 545].)

We explained: "[T]he abatement of a public nuisance involves a balancing of interests. On the one hand is the interest of the people in ridding their city of an obnoxious or dangerous condition; on the other hand is the interest of the landowner in using his property as he wishes. And when an establishment such as an adult bookstore is the subject of the abatement action, something more is added to the balance: not only does the landowner have a First

Amendment interest in selling protected material, but the public has a First Amendment interest in having such material available for purchase. Thus, as with an eminent domain action, the abatement of a public nuisance involves a delicate weighing of values. Any financial arrangement that would tempt the government attorney to tip the scale cannot be tolerated." (*Clancy, supra,* 39 Cal.3d at p. 749.) Moreover, "[a] suit to abate a public nuisance can trigger a criminal prosecution of the owner of the property. This connection between the civil and criminal aspects of public nuisance law further supports the need for a neutral prosecuting attorney." (*Ibid.*)

We concluded that James Clancy—although he was an independent contractor and not an employee of the City of Corona—nonetheless was subject to the same neutrality guidelines applicable to Corona's public lawyers, because "a lawyer cannot escape the heightened ethical requirements of one who performs governmental functions merely by declaring he is not a public official. The responsibility follows the job: if Clancy is performing tasks on behalf of and in the name of the government to which greater standards of neutrality apply, he must adhere to those standards." (*Clancy, supra,* 39 Cal.3d at p. 747.)

Finally, we held that because Clancy's hourly rate would double in the event Corona were successful in the litigation against the Ebels and the Book Store, it was evident that Clancy had an interest extraneous to his official function in the actions he was prosecuting on behalf of Corona. Accordingly, "the contingent fee arrangement between the City and Clancy is antithetical to the standard of neutrality that an attorney representing the government must meet when prosecuting a public nuisance abatement action. In the interests of justice, therefore, we must order Clancy disqualified from representing the City in the pending abatement action." (*Clancy, supra,* 39 Cal.3d at p. 750.) We expressly noted that Corona was not precluded from rehiring Clancy to represent it on other terms. (*Id.* at p. 750, fn. 5.)

Importantly, we also noted that "[n]othing we say herein should be construed as preventing the government, under appropriate circumstances, from engaging private counsel. Certainly there are cases in which a government may hire an attorney on a contingent fee to try a civil case." (*Clancy, supra,* 39 Cal.3d at p. 748.) As an example of such a permissible instance of representation, we cited *Denio v. City of Huntington Beach* (1943) 22 Cal.2d 580 [140 P.2d 392], a case in which we had approved a contingent-fee arrangement between the City of Huntington Beach and a law firm hired to represent it in all matters relating to protection of the city's oil rights. Thus, we recognized that contingent-fee arrangements in ordinary civil cases generally are permitted. (*Clancy, supra,* 39 Cal.3d at p. 748.)

## B

As is evident from the preceding discussion, our decision in *Clancy, supra,* 39 Cal.3d 740, was guided, in large part, by the circumstance that the public-nuisance action pursued by Corona implicated interests akin to those inherent in a criminal prosecution. In light of this similarity, we found it appropriate to invoke directly the disqualification rules applicable to criminal prosecutors—rules that categorically bar contingent-fee agreements in all instances. As we observed in *Clancy,* contingent-fee "contracts for criminal prosecutors have been recognized to be unethical and potentially unconstitutional, but there is virtually no law on the subject." (*Clancy, supra,* 39 Cal.3d at p. 748.) Nonetheless, we noted it is generally accepted that any type of arrangement conditioning a public prosecutor's remuneration upon the outcome of a case is widely condemned. (*Ibid.,* citing ABA Stds. for Crim. Justice, Prosecution Function, com. to former Std. 2.3(e) [" '[i]t is clear that [case-by-case] fee systems of remuneration for prosecuting attorneys raise serious ethical and perhaps constitutional problems, are totally unacceptable under modern conditions, and should be abolished promptly' "].)

Accordingly, although there are virtually no cases considering the propriety of compensation of public prosecutors pursuant to a contingent-fee arrangement, it would appear that under most, if not all, circumstances, such a method of compensation would be categorically barred. This is so because giving a public prosecutor a direct pecuniary interest in the outcome of a case that he or she is prosecuting "would render it unlikely that the defendant would receive a fair trial." (Pen. Code, § 1424, subd. (a)(1); see *Greer, supra,* 19 Cal.3d at p. 266 [explaining that disqualification was required in order to protect the defendant's fundamental due process right not to be deprived of liberty without a fair trial, and to enforce the prosecutor's obligation "to respect this mandate"].)[7]

Our opinion in *Clancy* recognized that the interests invoked in that case were akin to the vital interests implicated in a criminal prosecution, and thus

---

[7] It also seems beyond dispute that due process would not allow for a criminal prosecutor to employ private cocounsel pursuant to a contingent-fee arrangement that conditioned the private attorney's compensation on the outcome of the criminal prosecution. (See *State of Rhode Island v. Lead Industries Assn., Inc.* (R.I. 2008) 951 A.2d 428, 475, fn. 48 (*State of Rhode Island*) [explicitly refraining from allowing contingent-fee arrangement in the criminal context, because the court was "unable to envision a criminal case where contingent fees would ever be appropriate—even if they were not explicitly barred, as is the case in this jurisdiction"]; cf. *People v. Eubanks* (1996) 14 Cal.4th 580, 596, 598 [59 Cal.Rptr.2d 200, 927 P.2d 310] [finding cognizable conflict of interest because of the circumstance that the corporate crime victim paid the " 'substantial' " debts and expenses incurred by the district attorney investigating the case, and that such payment evidenced a " 'reasonable possibility' the prosecutor might not exercise his discretionary functions in an evenhanded manner"].)

invocation of the disqualification rules applicable to criminal prosecutors was justified. And if those rules are found to be equally applicable in the case now before us, disqualification of the private attorneys hired to assist the public entities similarly would be required.

■ As explained below, however, to the extent our decision in *Clancy* suggested that public-nuisance prosecutions *always* invoke the same constitutional and institutional interests present in a criminal case, our analysis was unnecessarily broad and failed to take into account the wide spectrum of cases that fall within the public-nuisance rubric. In the present case, both the types of remedies sought and the types of interests implicated differ significantly from those involved in *Clancy* and, accordingly, invocation of the strict rules requiring the automatic disqualification of criminal prosecutors is unwarranted.

The broad spectrum of public-nuisance law may implicate both civil and criminal liability.[8] Indeed, public-nuisance actions vary widely, as evidenced by Penal Code section 370, which broadly defines a public nuisance as "[a]nything which is injurious to health, or is indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property by an entire community or neighborhood, or by any considerable number of persons, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway . . . ."[9]

Although in *Clancy* we spoke generally of a "balancing of interests" and a "delicate weighing of values" (*Clancy, supra,* 39 Cal.3d at p. 749), our concerns regarding neutrality, fairness, and a possible abuse of the judicial process by an interested party appear to have been highly influenced by the circumstances of the case then before us—a long-running attempt by the City

---

[8] As explained by the authors of a recent law review article, public-nuisance law over the course of its development has become increasingly more civil in nature than criminal. The precepts of public-nuisance law migrated to colonial America from the English common law virtually unchanged, and at that time were primarily criminal. (Faulk & Gray, *Alchemy in the Courtroom? The Transmutation of Public Nuisance Litigation* (2007) 2007 Mich.St. L.Rev. 941, 951 (Faulk and Gray).) Eventually, however, violation of public-nuisance law came to be considered as a tort, and its criminal enforcement was invoked much less frequently. As state legislators began to enact statutes prohibiting particular conduct and setting specific criminal penalties for such conduct, there was little need for the broad and somewhat vague crime of nuisance. (*Ibid.;* Rest.2d Torts, § 821B, com. c, p. 88.)

[9] From its earliest incarnation in the common law, public-nuisance law proscribed an "interference with the interests of the community at large—interests that were recognized as rights of the general public entitled to protection." (Rest.2d Torts, § 821B, com. b, p. 88; see also Faulk & Gray, *supra,* 2007 Mich.St. L.Rev. at p. 951; Gifford, *Public Nuisance as a Mass Products Liability Tort* (2003) 71 U.Cin. L.Rev. 741, 790–791, 794.)

of Corona to shut down a single adult bookstore. As set forth above, when Corona's first attempts at legislating the bookstore out of business were ruled unconstitutional, it hired a private attorney with a personal and pecuniary interest in the case to file a nuisance action against the bookstore pursuant to a newly enacted ordinance that clearly was intended to specifically target that business.

The history of Corona's efforts to shut down the bookstore revealed a profound imbalance between the institutional power and resources of the government and the limited means and influence of the defendants—whose vital property rights were threatened. Under California law, the continued operation of an established, lawful business is subject to heightened protections. (See *Goat Hill Tavern v. City of Costa Mesa* (1992) 6 Cal.App.4th 1519, 1529 [8 Cal.Rptr.2d 385] [continued operation of 35-year business that was making recent substantial improvements was recognized as a vested right]; *Livingston Rock etc. Co. v. County of L. A.* (1954) 43 Cal.2d 121, 127 [272 P.2d 4] [noting that businesses generally cannot be immediately terminated due to nonconformance with rezoning ordinances, because of the "hardship and doubtful constitutionality" of such discontinuance].) It was in this factual setting that we noted that the abatement of a public nuisance involves a "balancing of interests. On the one hand is the interest of the people in ridding their city of an obnoxious or dangerous condition; on the other hand is the interest of the landowner in using his property as he wishes." (*Clancy, supra,* 39 Cal.3d at p. 749.)

The case also implicated both the defendants' and the public's constitutional free-speech rights. As we recognized in *Clancy*, the operation of the adult bookstore involved speech that arguably was protected in part, and thus curtailment of the right to disseminate the books in question could significantly infringe upon the Ebels' liberty interest in free speech. Again, our focus upon the critical "balancing of interests" was guided by the circumstance that Corona was attempting to abate a public nuisance created by an adult bookstore—thus adding something more "to the balance: not only does the landowner have a First Amendment interest in selling protected material, but the public has a First Amendment interest in having such material available for purchase." (*Clancy, supra,* 39 Cal.3d at p. 749.)[10]

---

[10] Moreover, we also found it significant that "[a] suit to abate a public nuisance can trigger a criminal prosecution of the owner of the property. This connection between the civil and criminal aspects of public nuisance law further supports the need for a neutral prosecuting attorney." (*Clancy, supra,* 39 Cal.3d at p. 749.)

As we explained, public-nuisance "actions are brought in the name of the People by the district attorney or city attorney. (Code Civ. Proc., § 731.) A person who maintains or commits a public nuisance is guilty of a misdemeanor. (Pen. Code, § 372.) 'A public or common nuisance . . . is a species of catch-all criminal offense, consisting of an interference with the rights of the community at large . . . . As in the case of other crimes, the normal remedy is in

It is evident that the nature of the particular nuisance action involved in *Clancy* was an important factor in leading us to conclude the rules governing the disqualification of criminal prosecutors properly should be invoked to disqualify James Clancy.[11] The direct application of those rules was warranted because the public-nuisance-abatement action at issue implicated important constitutional concerns, threatened ongoing business activity, and carried the threat of criminal liability. In light of these interests, the case required the same "balancing of interests" and "delicate weighing of values" on the part of the government's attorney prosecuting the case as would be required in a criminal prosecution. Because of this strong correlation, the disqualification of a private attorney with a pecuniary interest in the outcome of the case was mandated.

The public-nuisance action in the present case, by contrast, involves a qualitatively different set of interests—interests that are not substantially similar to the fundamental rights at stake in a criminal prosecution. We find this distinguishing circumstance to be dispositive. As set forth above, neutrality is a critical concern in criminal prosecutions because of the important constitutional liberty interests at stake. On the other hand, in ordinary civil cases, we do not require neutrality when the government acts as an ordinary party to a controversy, simply enforcing its own contract and property rights against individuals and entities that allegedly have infringed upon those interests. Indeed, as discussed above, we specifically observed in *Clancy* that the government was not precluded from engaging private counsel on a contingent-fee basis in an ordinary civil case. Thus, for example, public entities may employ private counsel on such a basis to litigate a tort action involving damage to government property, or to prosecute other actions in

---

the hands of the state.' " (*Clancy, supra*, 39 Cal.3d at p. 749, fn. omitted, quoting Prosser & Keeton, The Law of Torts (5th ed. 1984) p. 618.)

[11] The disqualification of public prosecutors is governed by Penal Code section 1424, which provides that a motion to recuse a prosecutor "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (Pen. Code, § 1424, subd. (a)(1); see *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711 [76 Cal.Rptr.3d 250, 182 P.3d 579] (*Haraguchi*) [noting that Pen. Code, § 1424 " 'articulates a two-part test: "(i) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting?" ' "].)

Although Penal Code section 1424 does not, by its terms, govern the conduct of civil government attorneys, we held in *Clancy* that certain government attorneys—because of the nature of the action they are prosecuting—must, like a criminal prosecutor, be free of any conflict of interest that might compromise a fair trial for the defendant. Although we did not invoke section 1424 in *Clancy* and instead analyzed the case under principles of neutrality—by considering whether an attorney's extraneous interest in a case would prejudice a defendant— the rule we applied unquestionably was derived from, and was substantially similar to, the conflict-of-interest rule applicable to criminal prosecutors. (See *Haraguchi, supra*, 43 Cal.4th at p. 711.)

which the governmental entity's interests in the litigation are those of an ordinary party, rather than those of the public. (*Clancy, supra*, 39 Cal.3d at p. 748.)

The present case falls between these two extremes on the spectrum of neutrality required of a government attorney. The present matter is not an "ordinary" civil case in that the public entities' attorneys are appearing as representatives of the public and not as counsel for the government acting as an ordinary party in a civil controversy. A public-nuisance-abatement action must be prosecuted by a governmental entity and may not be initiated by a private party unless the nuisance is personally injurious to that private party. (Civ. Code, § 3493 ["A private person may maintain an action for a public nuisance, if it is specially injurious to himself, but not otherwise."]; *id.*, § 3494 ["[a] public nuisance may be abated by any public body or officer authorized thereto by law"].) There can be no question, therefore, that the present case is being prosecuted on behalf of the public, and that accordingly the concerns we identified in *Clancy* as being inherent in a public prosecution are, indeed, implicated in the case now before us.

Yet, neither are the interests affected in this case similar in character to those invoked by a criminal prosecution or the nuisance action in *Clancy*. Although the remedy for the successful prosecution of the present case is unclear, we can confidently deduce what the remedy will *not be*. This case will not result in an injunction that prevents defendants from continuing their current business operations. The challenged conduct (the production and distribution of lead paint) has been illegal since 1978. Accordingly, whatever the outcome of the litigation, no ongoing business activity will be enjoined. Nor will the case prevent defendants from exercising any First Amendment right or any other liberty interest. Although liability may be based in part on prior commercial speech, the *remedy* will not involve enjoining current or future speech. Finally, because the challenged conduct has long since ceased, the statute of limitations on any criminal prosecution has run and there is neither a threat nor a possibility of criminal liability being imposed upon defendants.

The adjudication of this action will involve at least some balancing of interests, such as the social utility of defendants' product against the harm it has caused, and may implicate the free-speech rights exercised by defendants when they marketed their products and petitioned the government to oppose regulations. Nevertheless, that balancing process and those constitutional rights involve only past acts—not ongoing marketing, petitioning, or property/business interests. Instead, the trial court will be asked to determine whether defendants should be held liable for creating a nuisance and, if so, how the nuisance should be abated. This case will result, at most, in

defendants' having to expend resources to abate the lead-paint nuisance they allegedly created, either by paying into a fund dedicated to that abatement purpose or by undertaking the abatement themselves. The expenditure of resources to abate a hazardous substance affecting the environment is the type of remedy one might find in an ordinary civil case and does not threaten the continued operation of an existing business.

Of course, because this is a public-nuisance action, and the public entities are not merely pursuing abatement on government property but on private property located within their jurisdictions, defendants' potential exposure may be very substantial. The possibility of such a substantial judgment, however, does not affect the type of fundamental rights implicated in criminal prosecutions or in *Clancy, supra,* 39 Cal.3d 740. There is no indication that the contingent-fee arrangements in the present case have created a danger of governmental overreaching or economic coercion. Defendants are large corporations with access to abundant monetary and legal resources. Accordingly, the concern we expressed in *Clancy* about the misuse of governmental resources against an outmatched individual defendant is not implicated in the present case.

Thus, because—in contrast to the situation in *Clancy*—neither a liberty interest nor the right of an existing business to continued operation is threatened by the present prosecution, this case is closer on the spectrum to an ordinary civil case than it is to a criminal prosecution. The role played in the current setting both by the government attorneys and by the private attorneys differs significantly from that played by the private attorney in *Clancy*. Accordingly, the absolute prohibition on contingent-fee arrangements imported in *Clancy* from the context of criminal proceedings is unwarranted in the circumstances of the present civil public-nuisance action.[12]

---

[12] Nor is the applicable standard that which governs the disqualification of judges and other adjudicators. It is well established that the disqualification rules applicable to adjudicators are more stringent than those that govern the conduct of prosecutors and other government attorneys. (*People v. Freeman* (2010) 47 Cal.4th 993, 996 [103 Cal.Rptr.3d 723, 222 P.3d 177] [holding that for purposes of judicial disqualification, the constitutional standard is whether " ' "the probability of actual bias on the part of the judge or decisionmaker . . . is too high to be constitutionally tolerable" ' "], quoting *Caperton v. A. T. Massey Coal Co.* (2009) 556 U.S. ___ [173 L.Ed.2d 1208, 129 S.Ct. 2252]; Code Civ. Proc., § 170.1 [setting forth statutory grounds for disqualification of judges]; *Marshall v. Jerrico, Inc.* (1980) 446 U.S. 238, 243 [64 L.Ed.2d 182, 100 S.Ct. 1610] [noting that "the strict requirements of *Tumey* [*v. Ohio* (1927) 273 U.S. 510 [47 S.Ct. 437, 71 L.Ed. 749]] and *Ward* [*v. Village of Monroeville* (1972) 409 U.S. 57 [34 L.Ed.2d 267, 93 S.Ct. 80]] are not applicable to the determinations of the assistant regional administrator, whose functions resemble those of a prosecutor more closely than those of a judge"].)

## C

Nevertheless, as set forth above, because the public-nuisance-abatement action is being prosecuted on behalf of the public, the attorneys prosecuting this action, although not subject to the same stringent conflict-of-interest rules governing the conduct of criminal prosecutors or adjudicators, are subject to a heightened standard of ethical conduct applicable to public officials acting in the name of the public—standards that would not be invoked in an ordinary civil case.

■ The underlying principle that guided our decision in *Clancy* was that a civil attorney acting on behalf of a public entity, in prosecuting a civil case such as a public-nuisance-abatement action, is entrusted with the unique power of the government and therefore must refrain from abusing that power by failing to act in an evenhanded manner. (*Clancy*, *supra*, 39 Cal.3d at p. 749; see also *Greer*, *supra*, 19 Cal.3d at p. 267 [a prosecuting attorney " ' "is the representative of the public in whom is lodged a discretion which is not to be controlled by the courts, or by an interested individual" ' " (italics omitted)]; *City of Los Angeles v. Decker*, *supra*, 18 Cal.3d at p. 871 [a " 'government lawyer in a civil action . . . should not use his position or the economic power of the government to harass parties or to bring about unjust settlements or results' "].) Indeed, it is a bedrock principle that a government attorney prosecuting a public action on behalf of the government must not be motivated solely by a desire to win a case, but instead owes a duty to the public to ensure that justice will be done. (*Greer*, *supra*, 19 Cal.3d at p. 267.)

These principles of heightened neutrality remain valid and necessary in the context of the situation presented by the case before us. A fair prosecution and outcome in a proceeding brought in the name of the public is a matter of vital concern both for defendants and for the public, whose interests are represented by the government and to whom a duty is owed to ensure that the judicial process remains fair and untainted by an improper motivation on the part of attorneys representing the government. Accordingly, to ensure that an attorney representing the government acts evenhandedly and does not abuse the unique power entrusted in him or her in that capacity—and that public confidence in the integrity of the judicial system is not thereby undermined—a heightened standard of neutrality is required for attorneys prosecuting public-nuisance cases on behalf of the government.

■ We must determine whether this heightened standard of neutrality is compromised by the hiring of contingent-fee counsel to assist government attorneys in the prosecution of a public-nuisance-abatement action of the type involved in the present proceedings. For the reasons that follow, we conclude that this standard is not compromised. Because private counsel who are

remunerated on a contingent-fee basis have a direct pecuniary interest in the outcome of the case, they have a conflict of interest that potentially places their personal interests at odds with the interests of the public and of defendants in ensuring that a public prosecution is pursued in a manner that serves the public, rather than serving a private interest. This conflict, however, does not necessarily mandate disqualification in public-nuisance cases when fundamental constitutional rights and the right to continue operation of an existing business are not implicated. Instead, retention of private counsel on a contingent-fee basis is permissible in such cases if neutral, conflict-free government attorneys retain the power to control and supervise the litigation. As explained below, because public counsel are themselves neutral, and because these neutral attorneys retain control over critical discretionary decisions involved in the litigation, the heightened standard of neutrality is maintained and the integrity of the government's position is safeguarded. Thus, in a case where the government's action poses no threat to fundamental constitutional interests and does not threaten the continued operation of an ongoing business, concerns about neutrality are assuaged if the litigation is controlled by neutral attorneys, even if some of the attorneys involved in the case in a subsidiary role have a conflict of interest that might—if present in a public attorney—mandate disqualification.

This reasoning recently was embraced by the Supreme Court of Rhode Island, which approved the state attorney general's employment of private counsel on a contingent-fee basis to prosecute public-nuisance-abatement actions against lead paint manufacturers—a case identical in all material respects to the underlying action here. (*State of Rhode Island, supra*, 951 A.2d 428.) That court considered the propriety of the contingent-fee agreements in light of the state attorney general's status as a public servant, and his attendant responsibility to seek justice rather than prevail at all costs. (*Id.* at p. 472.) The state high court noted that the attorney general was bound by the ethical standards governing the conduct of public prosecutors. (*Ibid.*) Ultimately, citing the underlying decision of the Court of Appeal in the present case, the court in *State of Rhode Island* concluded that "there is nothing unconstitutional or illegal or inappropriate in a contractual relationship whereby the Attorney General hires outside attorneys on a contingent fee basis to assist in the litigation of certain *non-criminal* matters. Indeed, it is our view that the ability of the Attorney General to enter into such contractual relationships may well, in some circumstances, lead to results that will be beneficial to society—results which otherwise might not have been attainable. However, due to the special duty of attorneys general to 'seek justice' and their wide discretion with respect to same, such contractual relationships must be accompanied by exacting limitations. . . . [I]t is our view that the Attorney General is not precluded from engaging private counsel pursuant to a contingent fee agreement in order to assist in certain civil litigation, so long

as the Office of Attorney General retains *absolute and total control over all critical decision-making* in any case in which such agreements have been entered into." (*State of Rhode Island*, at p. 475, original italics, boldface & fns. omitted.)

█ We generally agree with the Supreme Court of Rhode Island and the Court of Appeal in the present case that there is a critical distinction between an employment arrangement that fully delegates governmental authority to a private party possessing a personal interest in the case, and an arrangement specifying that private counsel remain subject to the supervision and control of government attorneys. Private counsel serving in a subordinate role do not supplant a public entity's government attorneys, who have no personal or pecuniary interest in a case and therefore remain free of a conflict of interest that might require disqualification. Accordingly, in a case in which private counsel are subject to the supervision and control of government attorneys, the discretionary decisions vital to an impartial prosecution are made by neutral attorneys and the prosecution may proceed with the assistance of private counsel, even though the latter have a pecuniary interest in the case.

It is true that the public attorneys' decisionmaking conceivably could be influenced by their professional reliance upon the private attorneys' expertise and a concomitant sense of obligation to those attorneys to ensure that they receive payment for their many hours of work on the case. This circumstance may fairly be viewed as being somewhat akin to having a personal interest in the case. Nevertheless, this is not the type of personal conflict of interest that requires disqualification of the public attorneys. As this court has stated: " ' "[A]lmost any fee arrangement between attorney and client may give rise to a 'conflict.' . . . The contingent fee contract so common in civil litigation creates a 'conflict' when either the attorney or the client needs a quick settlement while the other's interest would be better served by pressing on in the hope of a greater recovery. The variants of this kind of 'conflict' are infinite. Fortunately most attorneys serve their clients honorably despite the opportunity to profit by neglecting or betraying the client's interest." ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 416 [87 Cal.Rptr.3d 209, 198 P.3d 11].)[13]

---

[13] In furtherance of their contention that the retention of private counsel on a contingent-fee basis is impermissible in public-nuisance-abatement actions because such financial arrangements create a sense of obligation toward private counsel on the part of public counsel, defendants and their amici curiae cite to our discussion of the obligation incurred by a criminal prosecutor toward the victim who provided substantial financial assistance to the district attorney's office in *People v. Eubanks, supra,* 14 Cal.4th 580, in which we held that the financial arrangement resulted in a disqualifying conflict of interest on behalf of the public prosecutor. (*Id.* at p. 596.) This reliance upon *Eubanks* is misplaced.

As a threshold matter, as we explained above, public-nuisance-abatement actions that do not implicate fundamental constitutional rights or threaten the operation of an existing business do

■ As recognized by the American Bar Association, attorneys are expected to resolve conflicts between their personal interests and their ethical and professional responsibilities "through the exercise of sensitive professional and moral judgment." (ABA Model Rules Prof. Conduct, preamble, par. 9.) In other words, attorneys are presumed to comport themselves with ethical integrity and to abide by all rules of professional conduct. In light of the supervisory role played by government counsel in the litigation—and

---

not invoke the same concerns regarding neutrality as those present in a criminal prosecution, and therefore attorneys pursuing such claims are not subject to the strict disqualification rules applicable to criminal prosecutors that we invoked to disqualify the public attorneys in *Eubanks*. Moreover, even under the disqualification standard applied in *Eubanks*, the retention of private counsel on a contingent-fee basis in public-nuisance actions is distinguishable from the financial arrangement we found impermissible in that case. In *Eubanks*, we reasoned that because criminal defendants have " 'no right to expect that crimes should go unpunished for lack of public funds,' " the mere fact that the victim's financial assistance enables the prosecutor to proceed further or more quickly "would not, by itself, constitute unfair treatment." (*Eubanks, supra,* 14 Cal.4th at p. 599.) Instead, a disabling conflict is established "in this factual context . . . only by a showing that the private financial contributions are of a nature and magnitude likely to put the prosecutor's discretionary decisionmaking within the influence or control of an interested party." (*Ibid.*; see also *Hambarian v. Superior Court* (2002) 27 Cal.4th 826, 836 [118 Cal.Rptr.2d 725, 44 P.3d 102] [recusal is not required simply because victim pays for expense the district attorney's office otherwise would have incurred].) Applying that reasoning to the retention of contingent-fee counsel by public entities pursuing public-nuisance-abatement actions, it is evident that individuals and business entities that create public nuisances similarly have no right to expect that abatement actions will not be brought "for lack of public funds." Thus, the mere circumstance that contingent-fee counsel enable public attorneys to prosecute the case does not, by itself, constitute unfair treatment.

Nor are the financial contributions of private counsel of a nature or magnitude likely to put the public attorneys' discretionary decisionmaking within the influence or control of an interested party. Unlike the financial assistance provided by the victim in *Eubanks*—a party with a strong personal interest in the outcome of the case and an expectation that the provision of financial assistance would incentivize the public attorneys to pursue the victim's desired outcome even if justice demanded a contrary course of action—the financial assistance in a public-nuisance case pursued with the assistance of contingent-fee counsel is provided by a group of sophisticated legal experts who have calculated the financial risk against the possible reward, and who are charged with the knowledge that public counsel's obligation to place justice above their desire to win a case may result in governmental decisions that do not maximize monetary recovery for the private attorneys.

This factual distinction is especially important in light of the specific contractual provisions we discuss, *post*. As we explain below, to ensure that the heightened standard of neutrality is maintained in the prosecution of a public-nuisance-abatement action, contingent-fee agreements between public entities and private counsel must contain specific provisions delineating the proper division of responsibility between the public and private attorneys. Specifically, those contractual provisions must provide explicitly that all critical discretionary decisions will be made by public attorneys—most notably, any decision regarding the ultimate disposition of the case. These contractual provisions reinforce the principle that the financial assistance provided by contingent-fee counsel is conditioned on the understanding that public counsel will retain full control over the litigation and, in exercising that control, must and will place their duty to serve the public interest in ensuring a fair and just proceeding above their sense of any obligation to maximize a monetary recovery for the private attorneys.

their inherent duty to serve the public's interest in any type of prosecution pursued on behalf of the public—we presume that government attorneys will honor their obligation to place the interests of their client above the personal, pecuniary interest of the subordinate private counsel they have hired.

As we have explained above, in the type of public-nuisance-abatement action being prosecuted in the present case, disqualification of counsel need not be governed by the stringent disqualification rules applicable to criminal prosecutors. Nevertheless, the role of the prosecutor provides useful guidance concerning the type of discretionary decisions that must remain with neutral government attorneys to ensure that the litigation is conducted in a conflict-free manner. A public prosecutor "has broad discretion over the entire course of the criminal proceedings, from the investigation and gathering of evidence, through the decisions of whom to charge and what charges to bring, to the numerous choices at trial to accept, oppose, or challenge judicial rulings." (*Hambarian, supra*, 27 Cal.4th at p. 840.) In *Greer*, we emphasized that it is "because the prosecutor enjoys such broad discretion that the public he serves and those he accuses may justifiably demand that he perform his functions with the highest degree of integrity and impartiality, and with the appearance thereof." (*Greer, supra*, 19 Cal.3d at pp. 266–267.) Accordingly, the "advantage of public prosecution is lost if those exercising the discretionary duties of the district attorney are subject to conflicting personal interests which might tend to compromise their impartiality." (*Id.* at p. 267; see also *Hambarian, supra*, 27 Cal.4th at p. 841 [holding that proper test for a disqualifying conflict of interest under Pen. Code, § 1424 is whether "the prosecutor's *discretionary decisionmaking* has been placed within the influence or control of an interested party"].)

■ A prosecutor's authority to make critical discretionary decisions in criminal cases is vital to ensuring the neutrality we require of attorneys entrusted with that position. This is so because such discretionary decisions provide the greatest opportunity to abuse the judicial process by placing personal gain above the interests of the public in a fair and just prosecution and outcome. For the same reason, in the context of public-nuisance-abatement proceedings, critical discretionary decisions similarly may not be delegated to private counsel possessing an interest in the case, but instead must be made by neutral government attorneys.

Accordingly, although the principles of heightened neutrality do not categorically bar the retention of contingent-fee counsel to assist public entities in the prosecution of public-nuisance-abatement actions, those principles do mandate that all critical discretionary decisions ultimately must be made by the public entities' government attorneys rather than by private counsel—in other words, neutral government attorneys must retain and exercise the

requisite control and supervision over both the conduct of private attorneys and the overall prosecution of the case. Such control of the litigation by neutral attorneys provides a safeguard against the possibility that private attorneys unilaterally will engage in inappropriate prosecutorial strategy and tactics geared to maximize their monetary reward. Accordingly, when public entities have retained the requisite authority in appropriate civil actions to control the litigation and to make all critical discretionary decisions, the impartiality required of government attorneys prosecuting the case on behalf of the public has been maintained.

Defendants assert that even if the control of private counsel by government attorneys is viable in theory, it fails in application because private counsel in such cases are hired based upon their expertise and experience, and therefore always will assume a primary and controlling role in guiding the course of the litigation, rendering illusory the notion of government "control." To the extent defendants assert that no contractual provision delegating the division of responsibility will or can be adhered to, we decline to assume that private counsel intentionally or negligently will violate the terms of their retention agreements by acting independently and without consultation with the public-entity attorneys or that public attorneys will delegate their fundamental obligations.[14]

Defendants also contend that the concept of "control" is unworkable as a standard to govern future cases, because it will be difficult (if not impossible) for a trial court to monitor whether government counsel for a public entity is adequately fulfilling his or her supervisory role and controlling all important aspects of the litigation, including procedural tactics, the gathering and presentation of evidence, the consideration and resolution of settlement negotiations, and other discretionary matters. Defendants assert that short of egregious actions on the part of private counsel or the supervising government attorney, violations of the "control" exception would be difficult to detect.[15]

---

[14] We also decline the suggestion of defendants and their amici curiae to view all contingent-fee agreements as inherently suspect because of an alleged "appearance of impropriety" created by such arrangements. Contingent-fee arrangements are deeply entrenched as a legitimate and sometimes prudent method of delegating risk in the context of civil litigation, and in the absence of evidence of wrongdoing or unethical conduct we decline to impugn this means of compensating counsel in the context of civil litigation.

[15] In the present case, the evidence of the public entities' control consists of the fee arrangements as well as the declarations submitted by the public entities and their private attorneys. (See, *ante*, at pp. 44–47 & fns. 2, 3 & 4.) Defendants assert in their briefing that they further attempted to obtain discovery regarding the actual control being exercised by the public entities, but that those entities refused to disclose any such additional documents, citing the attorney-client privilege.

■ These practical concerns do not require the barring of contingent-fee arrangements in all public prosecutions. Instead, to ensure that public attorneys exercise real rather than illusory control over contingent-fee counsel, retainer agreements providing for contingent-fee retention should encompass more than boilerplate language regarding "control" or "supervision," by identifying certain critical matters regarding the litigation that contingent-fee counsel must present to government attorneys for decision. The requisite specific provisions, described below, are not comprehensive panaceas and may not all operate perfectly in the context of every contingent-fee situation, but each of them will assist parties and the court in assessing whether private counsel are abusing their prosecutorial office. Moreover, adherence to these provisions is subject to objective verification both by defendants and by the court without the need for engaging in discovery that might intrude upon the attorney-client privilege or attorney work product protections.

In a case such as the present one, in which any remedy will be primarily monetary in nature, the authority to settle the case involves a paramount discretionary decision and is an important factor in ensuring that defendants' constitutional right to a fair trial is not compromised by overzealous actions of an attorney with a pecuniary stake in the outcome. Accordingly, retention agreements between public entities and private counsel must specifically provide that decisions regarding settlement of the case are reserved exclusively to the discretion of the public entity's own attorneys. Similarly, such agreements must specify that any defendant that is the subject of such litigation may contact the lead government attorneys directly, without having to confer with contingent-fee counsel. (Cf. ABA Recent Formal Ethics Opns., formal opn. No. 06-443 (Aug. 5, 2006) p. 179 ["Model Rule of Professional Conduct 4.2 generally does not prohibit a lawyer who represents a client in a matter involving an organization from communicating with the organization's inside counsel about the subject of the representation without obtaining the prior consent of the entity's outside counsel." (italics omitted)].)[16]

---

[16] The primacy of the discretionary authority to settle a case recently was invoked by a federal court in Ohio that considered Sherwin-Williams Company's challenge, on unspecified constitutional grounds, to the contingent-fee agreements between three Ohio cities and private counsel in a lead paint public-nuisance-abatement action very similar to the underlying action in the present case. (*Sherwin-Williams Co. v. City of Columbus* (S.D. Ohio, July 18, 2007, No. C2-06-829) 2007 U.S.Dist. Lexis 51945 [2007 WL 2079774].) The court originally had barred the private attorneys from providing legal representation, because "the contingency fee agreements between private counsel and the three cities were unconstitutional insofar as the agreements reposed an impermissible degree of public authority upon retained counsel, who have a financial incentive not necessarily consistent with the interests of the public body." (2007 U.S.Dist. Lexis 51945 at pp. *3–*4.) In a subsequent ruling, the court approved the two contingent-fee agreements that had been amended to expressly vest in the city attorney "control over the litigation and the sole authority to authorize any settlement of any claim or complaint." (*Id.* at p. *6.) The third agreement, however, still was deficient, because it provided that neither private counsel nor the city could settle or dismiss the case without the

Additionally, we adopt, in slightly modified form, the specific guidelines set forth by the Supreme Court of Rhode Island in *State of Rhode Island, supra,* 951 A.2d at page 477, footnote 52. Specifically, contingent-fee agreements between public entities and private counsel must provide: (1) that the public-entity attorneys will retain complete control over the course and conduct of the case; (2) that government attorneys retain a veto power over any decisions made by outside counsel; and (3) that a government attorney with supervisory authority must be personally involved in overseeing the litigation.

These specific provisions are not exhaustive. The unique circumstances of each prosecution may require a different set of guidelines for effective supervision and control of the case, and public entities may find it useful to specify other discretionary decisions that will remain vested in government attorneys. Nevertheless, the aforementioned provisions comprise the minimum requirements for a retention agreement between a public entity and private counsel adequate to ensure that critical governmental authority is not improperly delegated to an attorney possessing a personal pecuniary interest in the case.

## III

In the present case, five of the seven contingent-fee agreements between the public entities and private counsel contained in the record provide that the public entities' government counsel "retain final authority over all aspects of the Litigation."[17] Declarations of public counsel for these five public entities confirm that these individuals "retained and continue to retain complete control of the litigation," have been "actively involved in and direct all decisions related to the litigation," and have "direct oversight over the work of outside counsel." Private counsel submitted declarations confirming that the government counsel for the five public entities retain "complete control" over the litigation.[18] The references in these agreements to "final authority

---

consent of the other. (*Id.* at p. *10.) The court stated that it had made it "abundantly clear" in its previous ruling that a contingent-fee agreement "between a municipality and private counsel in a public nuisance action which purports to vest in private counsel authority to prevent a settlement or dismissal of a suit is unconstitutional." (*Ibid.*)

[17] These five agreements are those of San Francisco, Santa Clara, Alameda, Monterey, and San Diego.

[18] As noted above, Oakland and Solano have submitted declarations of their public counsel asserting that government attorneys retain full "control" over all aspects of the litigation. Nonetheless, those two entities' fee agreements in the record do not reflect this arrangement, make no provision for the retention of "final authority over all aspects" of the litigation, and do not otherwise specify that the private attorneys are subject to the supervision of public counsel. As noted above, the fee agreements for the County of Los Angeles, the City of Los Angeles, and San Mateo are not contained in the record before us.

over all aspects of the Litigation" fairly can be read to mandate that the government attorneys will supervise the work of the private attorneys, and will retain authority to control all critical decisionmaking in the case. The declarations establish that such general control and supervision have been exercised and are, in fact, being exercised.

Nevertheless, although five of the 10 fee agreements between the respective public entities and private counsel contain language specifying that control and supervision will be retained by the government attorneys, none of the 10 fee agreements in the present case contain the other specific provisions regarding retention of control and division of responsibility that we conclude are required to safeguard against abuse of the judicial process. Accordingly, because the seven agreements that are in the record are deficient under the standard we set forth above, and because we cannot assess the sufficiency of the three remaining agreements that are not contained in the record, we reverse the judgment rendered by the Court of Appeal and remand the matter for further proceedings consistent with this opinion. Assuming the public entities contemplate pursuing this litigation assisted by private counsel on a contingent-fee basis, we conclude they may do so after revising the respective retention agreements to conform with the requirements set forth in this opinion.

Kennard, J., Chin, J., Moreno, J., and Richman., J.,* concurred.

**WERDEGAR, J.,** Concurring.—I concur in the judgment insofar as it vacates the superior court's order barring the plaintiff public entities from paying their private counsel under contingent fee agreements.

Although I do not agree with every aspect of the majority's reasoning, I do agree this court spoke too broadly in 1985 when it prohibited contingent fee agreements in all public nuisance cases. (See *People ex rel. Clancy v. Superior Court* (1985) 39 Cal.3d 740, 748–750 [218 Cal.Rptr. 24, 705 P.2d 347] (*Clancy*).) As the majority explains, public nuisance cases comprise a wide range of factual situations, some of which do not necessarily entail a conflict of interest between public-entity plaintiffs and private attorneys retained under contingent fee agreements. To limit *Clancy* is thus appropriate, as the majority concludes.

In this case, however, at least a possible conflict of interest arises from the combination of two circumstances: The public entities assert they cannot afford to pay private counsel other than a contingent fee, and some of the fee

---

*Associate Justice of the Court of Appeal, First Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

agreements at issue give private counsel a share of the value of any abatement ordered by the court. Given the hypothetical choice between an abatement order of great public value and a less valuable cash settlement,[1] both the public and the private attorneys have an incentive to advocate the less valuable cash settlement, as it provides funds from which private counsel can be paid without an appropriation of public money representing the private attorneys' share of the value of abatement. Certainly this incentive does not amount to a personal conflict of interest requiring the public attorneys' recusal, as the majority explains (maj. opn., *ante*, at p. 59), but it does lead me to question whether public attorneys under all foreseeable circumstances will be able to exercise the independent supervisory judgment the majority concludes is essential if private counsel are to be retained under contingent fee agreements. Here, however, the parties' briefing on the subject of possible remedies is so vague, any such conflict is merely speculative.

In concurring in the judgment, I am also influenced by the concern that to grant defendants' motion might encourage parties in future cases to bring belated motions seeking to interfere with their opposing parties' attorney-client relationships for tactical reasons. Although plaintiffs commenced this action in 2000, and although defendants do not assert they learned of the contingent fee agreements only recently,[2] defendants did not challenge those agreements until 2007, after losing pretrial dispositive motions on appeal.[3] (See *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292 [40 Cal.Rptr.3d 313].) In ruling on a motion to disqualify counsel, the court may properly consider the possibility that the motion is a tactical device (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems* (1999) 20 Cal.4th 1135, 1145 [86 Cal.Rptr.2d 816, 980 P.2d 371]; *Comden v. Superior Court* (1978) 20 Cal.3d 906, 915 [145 Cal.Rptr. 9, 576 P.2d 971]) and deny the motion when unreasonable delay has caused great prejudice (*In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 599–600 [283 Cal.Rptr. 732]; *River West, Inc. v. Nickel* (1987) 188 Cal.App.3d 1297, 1313 [234 Cal.Rptr. 33]). To grant defendants' motion in this case could as a practical matter force plaintiffs to abandon their lawsuit after nearly a decade of pretrial litigation and discovery. While defendants have asked the court not to *disqualify* plaintiffs' counsel but instead simply to bar plaintiffs from *compensating* counsel on a contingent basis, the only authority for defendants' motion is

---

[1] The government cannot recover damages in public nuisance cases. (*People ex rel. Van de Kamp v. American Art Enterprises, Inc.* (1983) 33 Cal.3d 328, 333, fn. 11 [188 Cal.Rptr. 740, 656 P.2d 1170].)

[2] Plaintiff City and County of San Francisco's contingent fee agreement, for example, has been public knowledge since 2001, when the board of supervisors authorized the city attorney to enter into it. (S.F. Res. No. 190-01, as amended Feb. 13, 2001.)

[3] I recognize that until 2007 the complaint included additional causes of action that did not implicate contingent fee concerns, but this would not have precluded an earlier motion to prohibit contingent fee arrangements with respect to the public nuisance cause of action.

the body of law concerning disqualification. Because there is evidence indicating that an order prohibiting contingent fees would as a practical matter preclude private counsel's participation—in effect disqualifying them—the rule requiring timely presentation of the motion would logically apply.

Rivera, J.,* concurred.

---

*Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.