Filed 2/22/24  County of Sonoma v. Stavrinides CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| COUNTY OF SONOMA,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ELIAS STAVRINIDES et al.,<br><br>    Defendants and Appellants. | A165109; A166275<br><br>(Sonoma County<br>Super. Ct. No.<br>SCV265109) |

These consolidated appeals arise from a nuisance abatement action. The trial court ordered injunctive relief and imposed over $1 million in civil penalties against the defendants for a host of county code zoning and building violations (appeal No. A165109).  The court subsequently awarded the county over $87,000 in attorney fees and over $8,000 in costs (appeal No. A166275). Defendants Sean Musgrove and Elias Stavrinides both appeal from the judgment.  Stavrinides also appeals from the fee and cost award.[1]  With respect to Musgrove, we partially reverse as to the penalties.  In all other respects, we affirm.

## BACKGROUND

Musgrove and Stavrinides are co-owners of property in unincorporated Sonoma County.  The property is zoned agricultural/residential, and the

_____

[1] We ordered the appeals consolidated for argument and disposition.

1

county code prohibits cannabis cultivation in this zoning district. (Sonoma County Code, § 26-88-250(d) (SCC).) The county, through its code enforcement division, conducted two inspections of the property.

The first was conducted in August 2017. At the time, Musgrove was the sole owner, and he consented to the inspection. Based on the inspection, the county issued two notices of violation—one for zoning code violations for commercial cannabis cultivation, and the other for construction without a permit of 12 structures on the property (two cargo containers and 10 greenhouses). In December, the county issued official notices and orders in connection with the violations that directed Musgrove to abate the cannabis cultivation use and abate the construction nuisance by either removing the unlawful construction or legalizing it by obtaining permits and bringing the structures into compliance with county codes. By February 2018, Musgrove had removed the cannabis but had not abated the construction code violations.

More than a year later, in July 2019, the county conducted the second inspection, pursuant to an inspection warrant.[2] At that point, both Musgrove and Stavrinides owned the property. Based on this inspection, the county issued official notices and orders for numerous code violations, including: unlawful commercial cannabis use without zoning approvals/permits for an estimated 8,500 cannabis plants and a hash oil extraction operation; zoning code violations for junkyard conditions, a contractor's storage yard, and motor vehicle storage yard; building code violations for dangerous buildings (hazardous/non-permitted electrical and dangerous egress); building code

_____

[2] An inspection warrant is a court order directed to a state or local official commanding that person to conduct any inspection required or authorized by state or local law or regulation relating to building, fire, safety, plumbing, electrical, health, labor, or zoning. (Code. Civ. Proc., § 1822.50.)

violations for construction without a permit of various structures around the property, including living units, a hash oil extraction lab, an attic conversion, a mobile office, cargo containers; septic code violations for an unpermitted septic tank and leach field; and grading code violations for unpermitted fill exceeding 50 cubic yards. The notices advised Musgrove and Stavrinides that daily civil penalties were accruing.

Musgrove requested an administrative hearing. The county denied the request, electing to bypass the hearing process pursuant to a county resolution allowing the immediate filing of litigation in circumstances involving high risk violations.

Two months after the second inspection, the county filed the instant action alleging 18 separate violations of county codes, including multiple zoning violations, dangerous structures due to hazardous or unpermitted electrical, multiple structures constructed without a permit, an unpermitted septic system, and grading/drainage alteration without a permit. The county sought a judgment requiring defendants to cease the unlawful uses of the property, abate code violations, cease use of the property for cannabis cultivation or any cannabis related operations, and demolish buildings associated with the cannabis use. The county also sought civil penalties for the violations.

Shortly thereafter, the District Attorney filed criminal charges against Musgrove and Stavrinides for Health and Safety Code violations, including manufacturing a controlled substance, maintaining a place to unlawfully manufacture, store or distribute a controlled substance, possessing cannabis for sale, and planting, cultivating, harvesting or processing cannabis. Musgrove filed a motion to quash the inspection warrant and suppress the

3

evidence obtained from the search, which the trial court denied. The District Attorney eventually dismissed the criminal case in November 2021.

In the meantime, in September 2021, a court trial had commenced in the instant action. The county made several motions in limine, including a motion to preclude Musgrove and Stavrinides from relitigating the validity of the inspection warrant (motion No. 4). The trial court granted the motion on the ground Musgrove and Stavrinides were collaterally estopped from challenging the warrant. It additionally ruled that (a) even if collateral estoppel did not apply, the instant case was not quasi-criminal in nature and therefore the Fourth Amendment "exclusionary rule" did not apply and (b) regardless of the nature of the case, balancing "the deterrent effect of the [exclusionary] rule with its social costs," militated against the applicability of the rule in the instant action. (Boldface omitted.)

The parties then proceeded to put on their respective cases, which included testimony by Musgrove and written and oral closing argument.

Five months later, in February 2022, the court issued an oral ruling, which was not reported. The court entered judgment for the county the following month. The court ordered Musgrove and Stavrinides to, among other things, cease the unlawful and unpermitted uses of the property, cease the use of the property for any cannabis related operations, and abate the code violations. It also imposed over $1 million in civil penalties, and subsequently awarded the county $87,031.50 in attorney fees and $8,972.55 in staff costs.

## MUSGROVE'S APPEAL

Musgrove challenges the judgment on three grounds. First, he contends the trial court "erred in ruling that the proceeding was purely civil and not quasi-criminal in nature." (Boldface & capitalization omitted.)

4

Second, he challenges one of the civil penalties the court imposed—a $100,000 penalty for four unlawful cannabis violations. Third, he argues the penalties imposed were excessive, in violation of the federal and state Constitutions.

***The "Nature" of The Case***

Musgrove complains the trial court's refusal to consider the case quasi-criminal in nature "negat[ed] the defendants' rights to challenge the inspection/search warrant," allowed the county "to call [the defendants] to the stand," and "forced the defendants to take self-incrimination into account"— significantly impact[ing] and restrict[ing] their ability to present evidence."

He provides two citations to the record in support of his argument. The first is to page 86 of the reporter's transcript, at which point the trial court was addressing the county's motion No. 4, which sought to bar defendants from relitigating the validity of the inspection warrant given the denial of their motion to suppress in the criminal case. Musgrove's counsel argued the motion to suppress ruling did not constitute a "final judgment" for purposes of collateral estoppel. He further argued that if defendants successfully challenged the warrant in the instant case, they would be entitled to have the evidence obtained through the search excluded, since, according to counsel, the instant case should be considered a "quasi[-]criminal" proceeding in which the "exclusionary rule" would apply.[3]

The second record citation is to page 329 of the reporter's transcript. However, this citation is to the county's opening statement. We assume

---

[3] The exclusionary rule " 'is rarely applied in civil actions in the absence of statutory authorization, although government agencies may be involved, and even though the government itself unlawfully seized the evidence.' " (*Department of Transportation v. State Personnel Bd.* (2009) 178 Cal.App.4th 568, 576 (*Department of Transportation*).

5

Musgrove meant to cite to his attorney's further argument contesting the court's tentative ruling granting motion No. 4. Defense counsel reiterated his view that the case should be considered a quasi-criminal matter. He stated he had handled marijuana cases for years and in his experience all cases seeking to shut down cannabis operations, prior to the legalization of cannabis, were brought as criminal actions. The instant civil action, argued counsel, had many of the same attributes—a "raid," the destruction of the crop, and very significant "fines." Counsel further argued there had been no final judgment in the criminal case and therefore collateral estoppel could not apply.

At the conclusion of the hearing, the trial court adopted its tentative ruling in full. The ruling is detailed and exceeds four, single-spaced pages in length.

The court first concluded defendants were collaterally estopped from relitigating the legality of the warrant, expressly ruling the criminal court's denial of their motion to suppress constituted a "final decision on the merits, and that all other elements of collateral estoppel [had] also been met." (Boldface omitted.) "A ruling can be final," stated the court, "even without there being a subsequent judgment in the case."

The court further ruled that even if defendants were not barred by collateral estoppel from relitigating the validity of the warrant, the "exclusionary rule" did not apply because the instant action was civil, not quasi-criminal, in nature, rejecting Musgrove's argument that the array of penalties provided by the county codes rendered the proceeding quasi-criminal in character. The case on which Musgrove relied, said the court, did not hold that "any civil case involving 'penalties' is a quasi-criminal proceeding for which the exclusionary rule applies."

6

The court went on to state that while "the Courts focused initially on the nature of the proceedings in which the [exclusionary] rule was sought to be applied," they "later, consistent with the U.S. Supreme Court decisions, shifted the inquiry to whether the deterrent effect of the rule outweighed its costs." Applying this more recent standard, the court ruled that "whether analyzed by looking at the nature and object of the civil abatement proceeding, or by balancing the deterrent effect of the rule with its social costs," the exclusionary rule did not apply in the instant case. With respect to this point, the court observed defendants had cited "no case law where the exclusionary rule [had] been extended to a civil abatement of a public nuisance proceeding" and "given that the purpose of the civil abatement proceeding is to protect the public from public nuisances that can pose a danger to the health, safety, and well-being of the community, any deterrent effect of applying the exclusionary rule is outweighed by the social costs that would result from its application."

Thus, "*assuming arguendo* that collateral estoppel principles [did] not preclude relitigating the validity of the search warrant," the trial court concluded, "the inapplicability of the exclusionary rule would itself render the evidence of any unlawful search irrelevant."

The court added that since it had rejected the defendants' claim the action was quasi-criminal in nature, they could be called to testify although they could invoke their Fifth Amendment privilege against self-incrimination.

The only authority Musgrove cites in his opening brief in support of his argument that the trial court erred in ruling the instant case is civil, rather

than quasi-criminal, in nature is Health and Safety Code section 11570[4] and four cases, three of which pertain to cannabis operations and all of which are distinguishable.

However, before addressing Musgrove's cited authority, we observe he did not, in his opening brief, address either the first ground on which the trial court granted the county's motion No. 4—that defendants were collaterally estopped from relitigating the validity of the warrant—or the final ground— that under the balancing test now used by the courts, the exclusionary rule does not apply to the instant case. As a result, Musgrove has waived any claim that the trial court erred in granting the county's motion. "When a trial court states multiple grounds for its ruling and appellant addresses only some of them, we need not address appellant's arguments because 'one good reason is sufficient to sustain the order from which the appeal was taken.' " (*People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1237, quoting *Sutter Health Uninsured Pricing Cases* (2009) 171 Cal.App.4th 495, 513.)

Even if we were inclined to overlook Musgrove's waiver of the issue, his legal citations do not establish that the trial court erred in ruling the instant action is civil, not quasi-criminal, in nature.

By way of background, "[i]n 1996, California voters adopted Proposition 215, the 'Compassionate Use Act of 1996' [(CUA)] (Health & Saf. Code, § 11362.5). The act is intended to 'ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that

---

[4] Health and Safety Code section 11570, "[t]he so-called 'drug den' abatement law . . . provides that every place used to unlawfully sell, serve, store, keep, manufacture, or give away certain controlled substances is a nuisance that shall be enjoined, abated, and prevented, and for which damages may be recovered." (*City of Riverside v. Inland Empire Patients Health & Wellness Center, Inc.* (2013) 56 Cal.4th 729, 739.)

8

medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana'; 'ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction'; and 'encourage the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana.' ([Health & Saf. Code,] § 11362.5(b)(1)(A)–(C).) The act [also] provides in relevant part that it shall not 'be construed to supersede legislation prohibiting persons from engaging in conduct that endangers others. . . .' ([Health & Saf. Code,] § 11362.5, subd. (b)(2).)" (*County of Los Angeles v. Hill* (2011) 192 Cal.App.4th 861, 864, fn. omitted (*County of Los Angeles*).)

"In 2003, the Legislature added the 'Medical Marijuana Program Act' [(MMPA)], article 2.5, chapter 6, division 10 to the Health and Safety Code. The purposes of article 2.5 include '[promoting] uniform and consistent application of the [Compassionate Use Act of 1996] among the counties within the state' and '[enhancing] the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects.' (Stats. 2003, ch. 875, § 1, subd. (b), p. 6422.) The statute includes guidelines for the implementation of the Compassionate Use Act of 1996. Among other things, it provides that qualified patients and their primary caregivers have limited immunity from prosecution for violation of various sections of the Health and Safety Code regulating marijuana including the 'drug den' abatement law. ([Health & Safe. Code,] §§ 11362.765, 11362.775.) Most significant for our case, the statute provides: 'Nothing in this article shall prevent a city or other local governing body from adopting and enforcing laws

9

consistent with this article.' ([Health & Safe. Code,] § 11362.83.)" (*County of Los Angeles, supra,* 192 Cal.App.4th at p. 864, fn. omitted.)

In the earliest of the three cases Musgrove cites, *Qualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th 734, 741 (*Qualified Patients*), the plaintiff dispensaries "sought a declaratory judgment that the city's ordinance imposing *criminal penalties* for the operation of a medical marijuana dispensary was preempted by" the CUA and the MMPA and was unconstitutional under the Unruh Civil Rights Act (Civ. Code, § 51). (*Qualified Patients,* at p. 741, italics added.) The challenged ordinance provided " ' "It shall be unlawful for any person or entity to own, manage, conduct, or operate any Medical Marijuana Dispensary or to participate as an employee, contractor, agent or volunteer, or in any other manner or capacity, in any" ' " dispensary, and further provided "for *misdemeanor punishment* for 'any person who violates any provision of this ordinance. . . .' " (*Id.* at pp. 741–742, italics added.) The appellate court reversed the judgment of dismissal in part.

What is significant for purposes of the instant case is that the appellate court ultimately did not address "the issue of state preemption under the MMPA," which it commented was "by no means clear cut or easily resolved on first impressions. [The defendants] argue with much appeal, for example, that if the immunity from 'criminal liability' provided in [Health and Safety Code] sections 11362.765 and 11362.775 applies to 'the well-recognized quasi-criminal nature of [Health and Safety Code] [s]ection 11570,' the 'careful phrasing of the MMPA provides no suggestion that this narrow exclusion was intended to wholly eliminate *any* remedy for activities determined to be an *ordinary* nuisance under . . . legal authority' apart from [Health and Safety Code] section 11570. (Original italics; see also 3 Witkin, Cal. Proc. (5th ed.

10

2008) Actions, § 70, p. 144 [noting [Health and Safety Code] § 11570 qualifies as 'civil in nature,' but also 'quasi-criminal in effect' and 'character'].)  We do not decide these issues." (*Qualified Patients, supra,* 187 Cal.App.4th at pp. 754–755, fn. omitted.)  Because the trial court "did not address or determine that plaintiffs failed to state a claim for declaratory relief under the MMPA . . . it is not our province to do so in the first instance.  Moreover, as noted, factual issues that we may not resolve on appeal remain, including whether plaintiffs qualify as primary caregivers or otherwise for the MMPA's asserted protection against an ordinance imposing criminal punishment for operating a dispensary, and the manner in which plaintiffs intend to conduct their medical marijuana activities." (*Id.* at pp. 755–756.)

In short, the court in *Qualified Patients* dealt with a local ordinance that specifically regulated marijuana dispensaries and expressly imposed "criminal penalties" on violators.  The court had no occasion to, nor did it, discuss the analytical framework for deciding whether a proceeding is civil or quasi-criminal in character.  Moreover, here, none of the pertinent county codes imposed criminal penalties and all but one of the 18 regulatory violations alleged by the county were violations of *general* zoning and building codes.

In *County of Los Angeles,* the Court of Appeal addressed and answered the question left open in *Qualified Patients*—whether the immunities afforded by the MMPA foreclose " '*any* remedy for activities to be determined to be an *ordinary* nuisance under . . . legal authority.' " (*Qualified Patients, supra,* 187 Cal.App.4th at p. 755.)  *County of Los Angeles* was a nuisance abatement action in which the defendants appealed from a preliminary injunction prohibiting them from dispensing marijuana "without first obtaining the necessary licenses and permits required by [c]ounty

11

ordinances." (*County of Los Angeles, supra,* 192 Cal.App.4th at p. 863.) The court first rejected the defendants' claim that the local ordinances were preempted by the CUA and MMPA. (*Id.* at pp. 867–868.) The defendants "did not deny that they were operating [a dispensary] next to a library without having applied for a license, conditional use permit or zoning variance. Instead, they argued that these requirements were preempted by state law. . . ." (*Id.* at p. 865.) The appellate court held "if there was ever any doubt about the Legislature's intention to allow local governments to regulate marijuana dispensaries, . . . the newly enacted [Health and Safety Code] section 11362.768, has made clear that local government may regulate dispensaries." (*Id.* at p. 868.)

The court next rejected the defendants' claim that the county could not use its abatement ordinance to enforce the provisions of its dispensary ordinance. (*County of Los Angeles, supra,* 192 Cal.App.4th at p. 868.) "The limited statutory immunity from prosecution under the 'drug den' abatement law provided by [Health and Safety Code] section 11362.775 does not prevent the County from applying its nuisance laws to [dispensaries] that do not comply with its valid ordinances." (*Ibid.*) Rather, by its terms, Health and Safety Code section 11362.775 "exempt[ed] qualified patients and their primary caregivers (who collectively or cooperatively cultivate marijuana for medical purposes) from nuisance laws '*solely on the basis* of [the] fact' that they have associated collectively or cooperatively to cultivate marijuana for medical purposes. (Italics added.) The statute does not confer on qualified patients and their caregivers the unfettered right to cultivate or dispense marijuana anywhere they choose." (*County of Los Angeles,* at p. 869.)

The local zoning and regulatory ordinance at issue in *County of Los Angeles* apparently did not criminalize any conduct, as did the ordinance at

12

issue in *Qualified Patients*. Instead, the zoning ordinance designated any use not in compliance with the zoning code "a public nuisance" and authorized the county to seek an injunction against businesses operating in violation of the zoning laws. (*County of Los Angeles, supra,* 192 Cal.App.4th at p. 865.) In a footnote, the court observed, that "[a]lthough [Health and Safety Code] section 11570 does not contain criminal penalties, it is widely recognized as quasi-criminal in nature." (*Id.* at p. 869, fn. 5, citing *Qualified Patients, supra,* 187 Cal.App.4th at p. 755 & 3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 70, p. 144.) The court did not otherwise mention the point, let alone address the apparent differences between the zoning and regulatory ordinances before it and the ordinance at issue in *Qualified Patients*.

In the third and most recent cannabis case cited by Musgrove, *Browne v. County of Tehama* (2013) 213 Cal.App.4th 704 (*Browne*), the Court of Appeal addressed essentially the same issues as did the court in *County of Los Angeles*. In *Browne,* a group of medical marijuana users challenged a county ordinance that "place[d] numerical limits on the amount of medical marijuana that a qualified patient may cultivate while the CUA does not" and imposed a "complete ban on cultivating marijuana if (1) the qualified patient ha[d] only an oral, not a written, recommendation or approval from a physician; (2) the parcel [was] within 1,000 feet of a school or certain other properties or is too small to accommodate the setback requirements; and (3) the qualified patient [was] not the landowner and ha[d] not or [could not] obtain a notarized consent from the owner of the property." (*Id.* at p. 719.) "The fundamental flaw" in the petitioners' argument, said the court, was "their misplaced view that the CUA somehow creates or grants unrestricted rights." (*Ibid.*) "Simply put, the Ordinance . . . merely regulates and restricts locations of grows and amounts that may be grown on particular parcels.

13

Courts have routinely upheld this type of regulation of the location and conduct of agricultural activities." (*Id.* at p. 721.)

The court also rejected the petitioners' claim that the CUA and MMPA foreclosed the county from using nuisance abatement law to enforce the regulatory ordinance. "The limited statutory immunity from prosecution under [Health and Safety Code] section 11570 . . . does not prevent application of the nuisance provisions of the Ordinance. The limited immunity applies only to *a nuisance action based solely on the doing of the act that the Legislature has immunized*. Neither immunity statute precludes a local governing body from restricting or regulating the activity and declaring a nuisance if the activity is not conducted in conformity with the restriction or regulation." (*Browne, supra,* 213 Cal.App.4th at p. 724, italics added.)

The court went on to say that *if* a nuisance action were based *solely* on conduct the Legislature has immunized, then that immunity is a defense to such an abatement action. (*Browne, supra,* 213 Cal.App.4th at p. 724.) "Given the quasi-criminal nature of [Health and Safety Code] section 11570 and its inclusion in [Health and Safety Code] sections 11362.765 and 11362.775 [which speak of immunity from criminal liability and criminal sanctions] with other provisions of the Health and Safety Code that define crimes, . . . the immunity of [Health and Safety Code] sections 11362.765 and 11362.775 applies to the civil remedies of [Health and Safety Code] section 11570." (*Ibid.*) However, the county ordinance at issue did "not declare that every building in which the acts identified in [Health and Safety Code] section 11362.765 occur is a nuisance per se. Instead, such properties are nuisances only if the cultivation of marijuana is not conducted in accordance with the conditions of the Ordinance. It is the manner and location of cultivation that makes the activity a nuisance, not solely the act of

14

cultivating marijuana for medical purposes. Since the Ordinance's declaration of nuisance is not on the 'sole basis' of cultivating medical marijuana, the Ordinance does not conflict with [Health and Safety Code] section 11362.765." (*Ibid.*)

Thus, the most that can be said about *Browne* is that the court commented in passing that Health and Safety Code section 11570 is quasi-criminal in nature. The court did not engage in any analysis, let alone consider the issue presented here—whether the exclusionary rule and other procedural rights attendant to criminal prosecutions apply to a nuisance abatement action.[5]

Nor does *Board of Supervisors v. Simpson* (1951) 36 Cal.2d 671 (*Simpson*), compel the conclusion the trial court erred in concluding the procedural rights attendant to criminal cases do not apply to this nuisance abatement action. In *Simpson,* the county board of supervisors sought to compel the district attorney to institute proceedings to abate a public nuisance, namely a house of prostitution. (*Id.* at p. 672.) The district attorney maintained this was a civil matter for county counsel, and the

---

[5] We note that *People v. Braum* (2020) 49 Cal.App.5th 342 (*Braum*), which Musgrove cites in support of his challenge to the amount of the penalties, was a civil enforcement action against defendants for leasing commercial properties to medical-marijuana dispensaries operating in violation of the municipal zoning code. The court granted summary judgment and imposed significant penalties. (*Id.* at pp. 345–346.) The defendants raised numerous issues on appeal, including that the judgments, entered after a criminal proceeding had been resolved, violated the federal and state double jeopardy clauses. The court assumed, without deciding, the conduct at issue in the criminal complaint constituted the " 'same offense' " as the conduct at issue in the civil complaints and further assumed the "penalties imposed in the civil complaints at issue constituted criminal, rather than civil, penalties." (*Id.* at p. 358.)

15

Supreme Court observed an action by a governmental entity to abate a public nuisance is generally civil in nature. (*Ibid*.) But there were "other factors" indicating the matter at issue was more properly handled by the district attorney. (*Ibid*.) These included that the county charter provided "each county officer" was to exercise the powers prescribed by the charter and by general law. The "Red Light" abatement ordinance specifically imposed on the district attorney the duty to abate houses of prostitution. And state law specifically provided that county district attorneys were empowered to bring public abatement actions. (*Id*. at p. 673.) In addition, the abatement of places under the county's "Red Light Abatement" act was "compatible with [the district attorney's] duties as [a] public prosecutor," as such action was taken on behalf of the people. (*Id*. at p. 674.) Proceedings under the act were also "somewhat in the nature of actions to recover penalties or forfeitures," as property in such a place was "partially forfeited" and the locale could be "closed to use for any purpose for a year. [Citation.] It [was] penal in nature." (*Ibid*.) "While actions to abate nuisances are considered civil in nature . . . the abatement of houses of prostitution is in aid of and auxiliary to the enforcement of the criminal law." (*Ibid*.) Every day a public nuisance was maintained was "a separate offense and [was] a misdemeanor which it [was] the duty of the district attorney to prosecute by continuous prosecutions." (*Id*. at pp. 674–675.) The abatement act executed the policy of the state as established by the Penal Code statutes directed at prostitution. (*Id*. at p. 675.) The act, in other words, represented " 'the concrete application of the state's power of police.' " (*Ibid*.) The high court therefore concluded that the statutory powers of the district attorney "embrace[d] the abatement of such nuisances" and mandamus could properly issue to compel the district attorney to perform his duty to do so. (*Id*. at pp. 675–676.)

The facts and legal backdrop of the instant case are significantly different, starting with the fact the instant abatement proceeding was brought on behalf of the county, by county counsel. This also is not a proceeding implementing a matrix of state criminal statutes. To the contrary, as we have discussed, this is an action predicated almost entirely on *general* building and construction codes. And to the extent that one of the alleged zoning violations is based on zoning specific to cannabis-related use, the state statutory scheme pertaining to lawful cannabis use expressly allows for local zoning and regulatory ordinances. Nor do any state statutes make violation of local cannabis zoning ordinances a crime or penalize a violator by barring *any* use of the property for any period of time, let alone an extended period of time, as was the case in *Simpson.*

In sum, none of the authorities Musgrove cites demonstrates that the trial court erred in concluding, on the facts of this case, that the abatement proceeding is civil, rather than quasi-criminal, in nature. (See *County of Santa Clara v. Superior Court* (2010) 50 Cal.4th 35, 52 & fn. 8 [court stating that to the extent its "decision in [*People ex rel. Clancy v. Superior Court* (1985) 39 Cal.3d 740] suggested that public-nuisance prosecutions *always* invoke the same constitutional and institutional interests present in a criminal case, our analysis was unnecessarily broad and failed to take into account the wide spectrum of cases that fall within the public-nuisance rubric"; "public-nuisance law over the course of its development has become increasingly more civil in nature than criminal."].)

Furthermore, as the trial court went on to explain, the courts, including our Supreme Court, have moved away from characterizing civil cases as quasi-criminal in nature to resolve whether the exclusionary rule should apply. For example, in *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005,

17

despite all the procedural safeguards accorded to a potential conservatee, the high court reaffirmed that such proceedings are civil proceedings. (*Id.* at p. 1015.) It also explained that the characterization of a case is not determinative of whether the exclusionary rule should apply; instead, a court must weigh the deterrent effect of the rule with the social cost of applying it. (*Id.* at pp. 1016–1017.) It went on to hold this assessment militated against applying the rule in conservatorship proceedings. (*Id.* at pp. 1019–1020.)

Similarly, the Court of Appeal in *Park v. Valverde* (2007) 152 Cal.App.4th 877 (*Park*), applying the balancing test, concluded the exclusionary rule was inapplicable to the DMV administrative proceedings at issue. "On the one hand, [the court] acknowledge[d] that the application of the exclusionary rule . . . to DMV administrative proceedings could theoretically provide a supplemental basis for deterring law enforcement officials from maintaining inaccurate stolen vehicle records. On the other hand," the court also "consider[ed] the responsibility of the DMV to get drunk drivers off the road for the protection of society at large" and could not "ignore the fact that the criminal drunk driving proceedings and the DMV administrative proceedings serve different primary purposes—one to punish drunk drivers and one to get them off the streets." (*Id.* at p. 887.) Further, "[t]he suppression of evidence in the context of criminal proceedings," as was done in *Park,* "should provide adequate deterrence of wrongful police conduct in recordkeeping. Although the suppression of evidence in the DMV administrative proceedings as well could provide some supplemental deterrent effect, it would only be at the expense of protecting the public from the drunk driver, and indeed, protecting the drunk driver from himself. In order to permit the primary purpose of the DMV administrative proceedings to be served," the court concluded "the suppression of evidence in those

18

proceedings [was] not required in [the] case." (*Ibid.*) There also was "no indication of any egregious conduct" that "would support the application of the exclusionary rule" in the civil administrative proceeding before the court. (*Ibid.*)

The comments in *Park* are equally apropos here. The abatement action was brought not to punish defendants but to protect the public's health and wellbeing. Defendants also had the opportunity in the criminal action to challenge the validity of the warrant. Nor was there any indication of egregious conduct that justified application of the exclusionary rule in the instant case. Finally, Musgrove has not cited, nor are we aware of, a single nuisance abatement case where a court employed the exclusionary rule or recognized other procedural rights attendant to a criminal prosecution. (Cf. *People ex rel. Feuer v. Superior Court (Cahuenga's The Spot)* (2015) 234 Cal.App.4th 1360, 1364, 1384–1385 [rejecting defendants' arguments in action seeking to close dispensaries operating in violation of local zoning code and to impose significant penalties, that they were entitled to jury trial and were "being prosecuted both civilly and criminally"]; *People v. Toomey* (1984) 157 Cal.App.3d 1, 17 [" 'The constitutional safeguards applicable in the criminal area do not apply in a case presenting the possible exposure to civil penalties.' " Quoting *Peterson v. Superior Court* (1982) 31 Cal.3d 147, 161.].)

### Penalty for Cannabis Violations

The trial court imposed a $100,000 penalty "for four (4) separate unpermitted cannabis violations found on July 12, 2019, that were repeat offenses[,] $25,000 [for] each violation." The violations were: (1) manufacturing of cannabis, (2) outdoor cultivation of cannabis, (3) indoor cultivation of cannabis, and (4) mixed-light cultivation of cannabis.

19

*No Evidence of Unlawful Cannabis*

Musgrove first maintains there was no evidence the plants at issue were unlawfully planted "cannabis," rather than lawfully grown "hemp."

He points out the county code then in effect defined "Cannabis" as "[a]ll parts of the plant Cannabis sativa Linnaeus, Cannabis indica, or Cannabis ruderalis, or any other strain or varietal of the genus Cannabis . . . ; the seeds thereof; the resin . . . extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds, or resin. . . . For the purpose of this section, *'cannabis' does not mean 'industrial hemp' as defined by Section 81000 of the California Food and Agricultural Code or Section 11018.5 of the California Health and Safety Code. . . .*" (SCC, § 26-04-020, formerly § 26-02-140, italics added.) The referenced statutes, in turn, defined " '[i]ndustrial hemp' " or " 'hemp' " as "an agricultural product . . . that is limited to types of the plant Cannabis sativa L. and any part of that plant, including the seeds of the plant and all derivatives, extracts, the resin extracted from any part of the plant, cannabinoids, isomers, acids, salts, and salts of isomers, with a delta-9 tetrahydrocannabinol [(THC)] concentration of no more than 0.3 percent on a dry weight basis." (Food & Agr. Code, § 81000, subd. (a)(7); Health & Saf. Code, § 11018.5, subd. (a).)

Musgrove thus concludes the cultivation of "hemp" without a permit was not prohibited by the county code. The county does not take issue with Musgrove's reading of the applicable regulatory provisions.

Musgrove continues that there was "no evidence whatsoever" that the plants at issue were unlawfully cultivated "cannabis," rather than lawfully grown "hemp." According to Musgrove, the county failed to offer any evidence of laboratory results for the plants and one of the county's witnesses testified

20

he could not tell by visual inspection the difference between a THC plant, a CBD plant, and hemp. Rather, that determination required lab testing, which the witness did not perform.

The closest the county comes to responding to Musgrove's evidentiary argument, at least with any record citations, is a paragraph in the "Statement of Facts and Procedural History" section of its respondent's brief. The sum total of this paragraph is as follows: "No witness was called for Appellants who testified that the 8500 cannabis plants were not grown to produce THC. No witness or evidence was produced by Appellants to contradict the estimates of the street value of each crop of cannabis at the Property. The documentary evidence alone of the extent of the cannabis cultivation operation was not just substantial, it was overwhelming. (RA 0146-0183, 0201-0202) Discovery responses of the Defendants were also introduced to add to the overwhelming evidence. (RA 0202)"[6] (Boldface & some capitalization omitted.) Only by the thinnest of measures does this paragraph qualify as an adequate response to Musgrove's evidentiary argument.

To begin with, the county's first sentence is misdirected—Musgrove did not have the burden of proof in this case, so *he* was not obliged to call any witness to testify the plants were grown for hemp unless and until the county presented evidence the plants were unlawfully grown for cannabis. Next, the county provides no record citations in support of its second sentence, which suggests the county did present evidence as to the estimated value of each crop. As for the remainder of the paragraph, it is barely a substantive

---

[6] In the "Argument" section of its brief, the county similarly states, but without any citation to the record, that "[i]n addition to the hash oil extraction lab equipment, at least 8500 adult cannabis plants were discovered on the July 2019 inspection." (Capitalization omitted.)

response to assert, without any particulars, that the "documentary evidence alone" of the "extent" of the cannabis cultivation was "overwhelming," or that defendants' "[d]iscovery responses" "add[ed] to the overwhelming proof." The two record citations the county provides to support these statements are, for the most part, copies of photographs of the property, including the laboratory equipment, presumably taken at or around the time of the second inspection and a copy of defendants' exhibit list. The county provides no citations to the reporter's transcript of the trial.

However, the substantial evidence standard is satisfied by reasonable inferences that can be drawn from the evidence. As the courts have often recited, " 'We must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the [trier of fact's] findings and decision, resolving every conflict in favor of the judgment.' " (*Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 596.) Under the substantial evidence test, reversal " ' "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.) Here, the magnitude of the cultivation operation as shown by the photographs plus the presence of the hash oil extraction laboratory is sufficient, although barely so, to permit an inference that defendants were not growing cannabis for hemp, but rather, for a much more lucrative market, namely THC and CBD cannabis.[7]

---

[7] We emphasize that it is up to the parties to support their arguments on appeal, whether as appellant or respondent, with proper citations to the record. It is not our task to comb the record on any party's behalf to ferret out relevant evidence. (See *Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 684 ["The reviewing court is not required to develop the parties' arguments or search the record for supporting evidence and may

*Number of Violations*

Musgrove also challenges the number of cannabis violations found by the trial court, asserting the evidence supports only three, not four, violations.

Musgrove points out the county code defines "indoor cultivation" as cultivation "using *exclusively* artificial lighting" and defines "Mixed-Light" cultivation as "using natural light, light deprivation, and/or any *combination* of natural and supplemental artificial lighting." (Italics added.) He follows this with the assertion that the cultivation that occurred in the greenhouses fell within the definition of mixed-light cultivation because there was no evidence the greenhouses used artificial lighting *exclusively*. He thus concludes no evidence supports a violation for "indoor cultivation" and the trial court erred in imposing a penalty for such a violation.

The county makes no response at all to this argument in its respondent's brief. While this does not necessarily mean the county has conceded the issue (see *Griffin v. The Haunted Hotel, Inc.* (2015) 242 Cal.App.4th 490, 505 ["a respondent's *complete failure* to address an appellant's argument does not require us to treat the failure to respond as a concession the argument has merit"]), Musgrove's reading of the definitions is correct, and as we have already noted, it is not our task to comb the record on the county's behalf to find evidence that cannabis was grown in some structure with *exclusively* artificial light, supporting an "indoor cultivation" violation.

---

instead treat arguments that are not developed or supported by adequate citations to the record as waived."].)

*Second Violation*

Musgrove also challenges the trial court's finding that the cannabis manufacturing violation was a " 'second' " violation and thus subject to an increased penalty of $25,000. (The penalty for a first violation was $10,000. (SCC, § 26-88-252(d)(3)(c), 2019.)) The county's position in the trial court was that violations found during the 2017 inspection were "first" violations and violations found during the 2019 inspection were "second" violations.

Musgrove maintains there was no evidence of a cannabis manufacturing violation during the 2017 inspection, so the manufacturing violation found during the 2019 inspection—based on the hash oil extraction laboratory—was a first violation subject to the lower penalty.

The county again makes no response to this argument in its respondent's brief. Although, as we have observed, this does not necessarily mean the county has conceded the issue, we repeat it is not our obligation to sort through the record without any direction from the county as to where in the record such evidence might exist.

In sum, with respect to the cannabis violations, we shall reverse the $25,000 penalty against Musgrove for "indoor cultivation" and direct that the $25,000 penalty for cannabis manufacturing against Musgrove be reduced to $10,000 (resulting in total cannabis fines owing of $60,000).

**Excessive Fines**

Musgrove lastly claims the fines imposed by the trial court violate the Eighth Amendment's limit on excessive fines under the standard articulated in *United States v. Bajakajian* (1998) 524 U.S. 321 (*Bajakajian*). (See *City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1321 ["The law is settled that a civil penalty such as the one here, by virtue of its

24

partially punitive purpose, is a fine for purposes of the constitutional protection" afforded by the eighth amendment, italics omitted].)

In *Bajakajian*, the United States Supreme Court explained that the "touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." (*Bajakajian*, *supra*, 524 U.S. at p. 334.) It then identified four factors that bear on whether a fine is constitutionally excessive: (1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay. (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728; *Braum*, *supra*, 49 Cal.App.5th at pp. 360–363, 365 [applying *Bajakajian* factors and affirming civil penalties imposed against cannabis dispensary operating in violation of local regulatory ordinances].)

The trial court imposed seven separate penalties totaling over $1 million for various zoning, building, septic, grading and drainage code violations. Musgrove does not specifically identify which penalties he is challenging. However, in discussing the *Bajakajian* factors, he largely refers to the cannabis violations and laws and cases pertaining to cannabis. We therefore treat his arguments as directed largely at the amount of the penalties pertaining to the cannabis violations.[8]

---

[8] As discussed in the preceding section of this opinion, the trial court imposed $100,000 in penalties for the cannabis violations, which we shall order reduced to $60,000. These violations were also the basis for one of five zoning violations for which the trial court imposed penalties of $35 per day from July 12, 2019 through November 3, 2021, totaling $147,875. Thus, the total daily penalty for that cannabis-based zoning violation was $29,575, making the total cannabis penalties remaining at issue, $89,575.

*Culpability*

Musgrove does not dispute that as one of the property owners he is liable for the nuisance conditions. In fact, he "concedes that there was evidence at the trial to support a finding that he was culpable for at least some of the initial violations."

Musgrove instead focuses on alleged delay in the instant action that allowed daily penalties to continue to accrue. He argues this delay was attributable to sources other than himself, including the county's decision to bypass the administrative appeal process and file the instant case, the district attorney's decision to file criminal charges, and the Covid-19 pandemic. He provides no specifics with respect to such delays. Nor does he provide any citations to the record that establish the duration of such delays.

Moreover, he cites no authority that this factor—the defendant's culpability—pertains to increased daily penalty amounts caused by extraneous delay, rather than by the defendant's creating and failing to eliminate a panoply of code violations. In *Braum*, for example, on which Musgrove principally relies, the appellate court focused on the evidence establishing the defendant's culpability for the underlying zoning code violations and abatement law offenses. (*Braum, supra*, 49 Cal.App.5th at p. 361; see *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co., supra*, 37 Cal.4th at p. 729 [with respect to culpability, the defendant argued it acted with a reasonable and good faith belief that its unlawful conduct was protected by a safe harbor provision of the statute it was alleged to have violated].) Here, as the county points out, had Musgrove ceased all cannabis operations following the first inspection in August 2017, the daily penalties imposed in connection with the second inspection and resulting notices and orders would not have accrued.

*Relationship Between the Harm and the Penalty*

Musgrove argues the enactment of the CUA and the MMPA "represents a societal movement to treat cannabis as a far less serious problem," but the county not only maintained its criminal sanction for unlawful cannabis activities, it also "added civil penalties up to $50,000." On the other hand, the county also "allowed all persons found to be unlawfully cultivating cannabis in 2017 to continue to do so until January 1, 2018." Musgrove thus concludes "unlawful cannabis cultivation" does not present any "clear and present danger" that needed to be immediately halted on pain of continuing penalties. He further asserts the county presented no "evidence whatsoever" concerning the harm caused by unlawful cannabis cultivation.

As the county points out, the Legislature expressly recognized the negative impacts of unregulated cannabis cultivation in enacting the statutory scheme which expressly authorizes local regulation of cultivation. This, alone, supplies a sufficient relationship between the harm of unregulated cannabis production of the magnitude here and the penalties imposed. (See *Braum, supra,* 49 Cal.App.5th at p. 362 ["The City had a valid and strong interest in regulating uses within the City, including medical marijuana uses, and in abating nuisances defined by state law to address the perceived harms underlying its zoning regulations and the statewide nuisance abatement law."].) The county also directs our attention to the evidence of hazardous conditions on the property, including exposed electrical connections and unpermitted septic use. This, of course, exacerbated the already unlawful condition of the property.

27

*Comparative Penalties*

Musgrove points out the maximum criminal penalty under state law is a $500 fine, for a first offense. (Health & Saf. Code, § 11358, subd. (c).)[9] The minimal criminal penalties, says Musgrove, stand in stark contrast to the penalties imposed here. He further points out the penalty for violating zoning rules against growing other agricultural crops in a non-agricultural zone is limited to $100 for the first violation, $200 for a second violation, and $500 for a third violation within one year—again, much less than the cannabis-related penalties imposed here. (SCC, § 1-7.1, 2019.)

The county responds that Musgrove focuses only on the cannabis penalties and disregards "all the other violations." We agree that as to this point, Musgrove has confined his argument to the cannabis penalties.

With respect to the cannabis penalties, the county points to Business and Professions Code section 26038 which is part of the state's statutory scheme establishing a licensing process for cannabis businesses and imposing civil penalties for unlicensed commercial cannabis activity. (Bus. & Prof. Code, §§ 26010–26018 [administration provisions]; *id*., §§ 26030–26037 [enforcement provisions]; *id*., § 26038.) The purpose of this regulatory scheme "is to establish a comprehensive system to control and regulate the cultivation, distribution, transport, storage, manufacturing, processing, and sale of both" medicinal and adult-use cannabis and to identify "the power and duties of the state agencies responsible for controlling and regulating the commercial medicinal and adult-use cannabis industry." (*Id*., § 26000, subds. (b)(1)–(2), (c).) It also expressly provides it "shall not be interpreted to

---

[9] In his opening brief, Musgrove states "The Sonoma County Ordinance allows for an identical 6 month/$500 penalty in addition to the fine structure challenged herein." He provides no record citations in support, nor have we located any such a provision in the record.

28

supersede or limit existing local authority" to enforce zoning requirements or local ordinances, including "local license, permit, or other authorization requirements." (*Id.*, § 26200, subd. (a)(2).)

Business and Professions Code section 26038, specifically, contains three penalty provisions. The first provides that, "A person engaging in commercial cannabis activity without a license as required by this division shall be subject to civil penalties of up to three times the amount of the license fee for each violation. Each day of operation shall constitute a separate violation of this section." (Bus. & Prof. Code, § 26038, subd. (a)(1).) The second provides that, "A person aiding and abetting unlicensed commercial cannabis activity shall be subject to civil penalties of up to three times the amount of the license fee for each violation, but in no case shall the penalty exceed thirty thousand dollars ($30,000) for each violation. Each day of operation of unlicensed commercial cannabis activity that a person is found to have aided and abetted shall constitute a separate violation of this section." (*Id.*, § 26038, subd. (a)(2)(A).) The third provides, "A person who has management or control of a commercial property, or a commercial building, room, space, or enclosure, either as an owner, lessee, agent, employee, or mortgagee, who knowingly rents, leases, or makes available for use, with or without compensation, the commercial property, building, room, space, or enclosure for the purpose of the unlicensed commercial cultivation, manufacture, storage, sale, or distribution of cannabis shall be subject to civil penalties of up to ten thousand dollars ($10,000) for each violation. Each day of violation shall constitute a separate violation of this section." (*Id.*, § 26038, subd. (a)(3)(A).) Thus, the penalties under this statutory scheme can be significant.

The county's cannabis penalty provisions, by comparison, are not excessive.  (See *Braum, supra,* 49 Cal.App.5th at pp. 354, 365 [upholding maximum civil penalty of $2,500 per day for dispensary operated in violation of city zoning code for 1,470 days and maximum penalty of $25,000 for dispensary property under Health and Safety Code sections 11570 and 11581].)

*Ability to Pay*

Musgrove contends that he and Stavrinides presented evidence they were of limited economic means and therefore cannot pay the $1,056,880 in penalties, that is, the entirety of the penalties, imposed by the court.

*Braum* indicates it was Musgrove's burden to show he has no ability to pay the penalties.  (*Braum, supra,* 49 Cal.App.5th at pp. 362–363.)  And recently another division of this court stated that "[b]ecause ability to pay is an element of the excessive fines calculus under both the federal and state Constitutions, . . . a sentencing court may not impose court operations or facilities assessments or restitution fines without giving the defendant, *on request*, an opportunity to *present evidence and argument why such monetary exactions exceed his ability to pay*."  (*People v. Cowan* (2020) 47 Cal.App.5th 32, 48, review granted June 17, 2020, S261952, italics added.)

Musgrove does not disagree that defendants had the burden of requesting an opportunity to make their case of impoverishment, and at such hearing, to present evidence substantiating their claim.  Nor does he provide any citation to the record of having asked for such a hearing or having made an affirmative showing of his assertedly impecunious circumstances.

Instead, Musgrove points out Stavrinides was represented by court-appointed counsel in the criminal case and likewise for a short time in the instant case.  This is scarcely relevant to Musgrove, who was admittedly

30

represented by private counsel. Musgrove also points to his testimony at trial as to why he had not promptly removed the greenhouses. According to Musgrove, he did not have the economic wherewithal to pay the permit fees to remove the structures after the county increased the fees from $1600 to $64,000 (an amount the county subsequently backed down to $1600 and which he then paid).

The county's response is that Musgrove's "word" is not a sufficient showing of inability to pay and that "[n]o explanation is given [by Musgrove] as to where the millions of dollars of profit from the cannabis cultivation has gone." The problem with this response is that the county again provides no citation to the record of evidence that the defendants in fact made "millions of dollars of profit." Thus, based on the county's briefing, we would conclude simply that Musgrove bore the burden of proof but points to no place in the record where he asked for the opportunity to make an affirmative showing that his financial situation is so dire in renders the total penalties constitutionally excessive.

In his closing brief, Musgrove helpfully supplies record citations to Code Inspector Todd Hoffman's testimony about "average cannabis plant yields and street prices." Hoffman also testified to the number of plants at issue here and initially opined the grow represented "billions of dollars," but on further questioning by county counsel agreed it was worth five million. Musgrove maintains this was not a fair estimate as Hoffman did not consider all the "variables" that plant affect value, including size, maturity, and genetic strain. However, this is an argument going to the weight given to the testimony, which is not an issue that is properly revisited on appeal. (See *Morgan v. J-M Manufacturing Co., Inc.* (2021) 60 Cal.App.5th 1078, 1086 [it

31

is the province of the trier of fact " 'to resolve the conflicts in the evidence and to pass upon the weight to be given the evidence' "].)

**STAVRINIDES'S APPEALS**

### *Appeal From Judgment*

Stavrinides filed his appellant's opening brief on June 1, 2023, more than two months before Musgrove filed his opening brief.  Stavrinides's opening brief is eight pages in length, including the caption page, table of contents, table of authorities, certificate of word count, and certificate of interested entities or persons.  The remaining four pages of text are broken into the following separately entitled sections:  "Nature Of The Superior Court Case," "Relief Sought In The Trial Court," "Appealed Order Statement Of Appealability," "Summary Of Significant Facts," "Relief Sought By This Appeal," "Non-Waiver of California Government Code § 68081," and "Conclusion."  (Boldface omitted.)

In the "Relief Sought" section of his brief, Stavrinides states he seeks the "reversal, vacating, and or nullification" of the judgment.  But in no section of his brief does he identify the reasons why he believes the trial court erred, let alone provide reasoned argument, citations to the record, and citations to legal authorities in support of such argument.

Rather, the single assertion Stavrinides makes in his opening brief (under the heading "Summary Of Significant Facts") is that "further reference to an Appellant's Appendix record on appeal is not possible at this time until the lower court complies with" a document he filed in the trial court entitled "Elias Stavrinides's *Second* California 1st District Court of Appeal Local Rule 11 (c) Request For The Clerk or Court Executive Officer Robert Oliver to Provide Documents That Are Not Yet Part of And are Missing From The Court Record, With Notice of Error Regarding Court

32

Report Transcripts of An Elected Appendix."[10]  (Boldface & underscoring omitted.)  He follows this with an assertion (under the heading "Non-Waiver of California Government Code § 68081," boldface omitted) that he "does not waive the statutory provision of . . . Government Code § 68081," which he quotes.[11]  He concludes (under the heading "Conclusion," boldface omitted) with the statement he will, pursuant to that statutory provisions, "file a supplement[al]" brief to his opening brief and a "supplement" to his appendix when the trial court "complies" with his Second Request.[12]  In short, his

---

[10]  In both a "First Request" and his essentially identical "Second Request," Stavrinides claimed he had not received a complete copy of the record on appeal and, specifically, he had not received copies of all the volumes of the reporter's transcript of the court trial.  He further claimed, as a consequence, that an "automatic stay" of the briefing was in place pursuant to this court's Local Rule 11(c).  Local Rule 11, subdivision (c) entitled "Automatic Extension for Omitted Record" states: "If a party asks the superior court to prepare an omitted part of the record under California Rules of Court, rules 8.155(b), 8.340(b), or 8.410(a), and provides this court with notice of the request, the deadline for filing the party's brief shall be automatically extended by 15 days from the date the omitted part of the record is filed.  This extension shall not shorten any other extensions of time that are granted."  (Ct. App. First Dist. Local Rules, rule 11, Extensions of Time for Filing Briefs.)

[11]  Government Code section 68081 provides: "Before the Supreme Court, a court of appeal, or the appellate division of a superior court renders a decision in a proceeding other than a summary denial of a petition for an extraordinary writ, based upon an issue which was not proposed or briefed by any party to the proceeding, the court shall afford the parties an opportunity to present their views on the matter through supplemental briefing.  If the court fails to afford that opportunity, a rehearing shall be ordered upon timely petition of any party."

[12]  Government Code section 68081, by its plain terms, pertains to a *Court of Appeal's disposition* of a case and the right of a party to file a supplemental brief *if* the court decides the case on a ground not raised by any party.  The statute does not, contrary to Stavrinides's apparent belief, allow

33

opening brief is essentially a complaint that the record on appeal was not complete.[13] This is not a basis for reversal of the judgment.

" ' "[A]n appealed judgment is presumed correct, and appellant bears the burden of overcoming the presumption of correctness." [Citation.] As a result, on appeal "the party asserting trial court error may not . . . rest on the bare assertion of error but must present argument and legal authority on each point raised. [Citation.]" [Citations.] When an appellant raises an issue "but fails to support it with reasoned argument and citations to authority, we treat the point as waived. [Citations.]" [Citation.]' (*Ibid.*) By failing to provide adequate record citations or make any cognizable claims of error." (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277.) Stavrinides has waived any claim of error by the lower court.

There was, moreover, no need for Stavrinides to file an opening brief bereft of legal substance. In his designation of the record on appeal, filed May 9, 2022, Stavrinides elected to proceed with an appellant's appendix in lieu of a clerk's transcript and a settled statement in lieu of a reporter's transcript. On June 6, he submitted a proposed settled statement to the trial court. The county filed a response. On October 4, the trial court issued an order as to the settled statement, which included a directive that a reporter's transcript be prepared of the trial. On October 17, the superior court clerk duly issued a "Notice to Reporter" to prepare a transcript of the trial.

---

the filing of a "place-holder" opening brief that promises a "supplemental" brief when asserted record issues are resolved.

[13] Stavrinides's appellant's appendix consisted solely of his designation of the record on appeal, his notice of appeal from the judgment, his "Second Request," the trial court's judgment, and the court's order awarding fees and costs.

The reporter's transcript (consisting of 16 volumes) was filed in this court on March 8, 2023. That same day, the clerk gave notice to Stavrinides that the record on appeal had been filed and his opening brief was due in 40 days. A little over a month later, on April 17, Stavrinides filed his "First Request" in the trial court, asserting he had not received all the volumes of the reporter's transcript and under our Local Rule 11, subdivision (c), an automatic stay of his appeal was in effect. On the same day, Stavrinides filed a "Notice" of his "First Request" in this court and the superior court clerk, in response, provided a declaration that Stavrinides had elected to proceed by way of an appendix and not a clerk's transcript, and no further action by the clerk was required. On April 28, the clerk of this court issued a notice that no "augmented" or "omitted" record would be forthcoming because he had elected to proceed by way of an appendix (California Rules of Court, rule 8.124). On May 22, this court notified Stavrinides his appeal would be dismissed if he did not file his opening brief within 15 days or show good cause for an extension.

A week later, on May 30, Stavrinides filed his "Second Request," asserting he had not received a complete copy of the reporter's transcript and an automatic stay of his appeal was in effect. The following day, on May 31, he filed a "Notice" of his "Second Request" in this court. Two days later, on June 1, the clerk of this court transmitted copies of the assertedly missing reporters transcripts to Stavrinides, and issued a notice his opening brief was due in 15 days. Stavrinides filed his opening brief on June 1.

While there may have been some confusion as to Stavrinides's receipt of a complete copy of the reporter's transcript, it is clear Stavrinides was aware the transcripts were ordered, prepared, and transmitted to this court. He was also on notice of the filing date for his opening brief, which was extended

35

when the clerk of this court provided him with copies of the assertedly missing transcripts. *At no time*, did Stavrinides file a request for an extension of time to file his opening brief. Instead, he filed his opening brief the same day he received the copies of the assertedly missing volumes of the reporter's transcript. In contrast, Musgrove obtained a stipulation extending his time to file his opening brief and two additional extensions of time granted by this court. As we have observed, an opening brief that raises no issues, let alone provides no cogent argument supported by citations to the record and legal authority, waives any arguable issue(s) on appeal. (See *Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 488–489.)

Stavrinides filed a 32-page appellant's closing brief in which he first rehashes his complaint about the assertedly missing volumes of the reporter's transcript and then maintains his review of the reporter's transcript—after he filed his opening brief—"demonstrate[s]" that the trial court "lacked all subject matter jurisdiction" over the enforcement action. He devotes the remainder of his closing brief to "Argument Against Respondents' Brief Reasoning for Denial of Administrative Procedures and Argument Enhancing and Supporting Co-Appellant Sean C. Musgrove's Opening Brief Reference To His and Appellant Elias Stavrinides Denial of Administrative Procedures." (Boldface omitted.) The thrust of Stavrinides's argument, as best as we can make out, is that an administrative process had not yet been completed and therefore the trial court lacked "subject matter jurisdiction" over the abatement proceeding. As our discussion of Musgrove's appeal reflects, this is not an argument Musgrove advanced on appeal.

"We will not ordinarily consider issues raised for the first time in a reply brief. [Citation.] An issue is new if it does more than elaborate on

issues raised in the opening brief or rebut arguments made by the respondent in respondent's brief.  Fairness militates against allowing an appellant to raise an issue for the first time in a reply brief because consideration of the issue deprives the respondent of the opportunity to counter the appellant by raising opposing arguments about the new issue." (*American Indian Model Schools v. Oakland Unified School Dist.* (2014) 227 Cal.App.4th 258, 275–276.)

We observe, moreover, that failure to exhaust administrative remedies rarely affects a trial court's "fundamental"—or subject matter—jurisdiction. (See, e.g., *Holland v. Union Pacific Railroad Co.* (2007) 154 Cal.App.4th 940, 946 ["The exhaustion of an administrative remedy is a procedural prerequisite to an action at law, and the failure to exhaust it does not divest a trial court of subject matter jurisdiction."  (Italics omitted.)]; *Keiffer v. Bechtel Corp.* (1998) 65 Cal.App.4th 893, 896–901 [cases describing exhaustion as jurisdictional do not necessarily implicate fundamental subject matter jurisdiction]; *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1216 ["cases that describe the requirement as 'jurisdictional' simply stand for the unremarkable proposition that the court does not have the discretion to refuse to apply the doctrine in cases where it applies"]; see generally 1 Cal. Affirmative Def. (2d ed.) § 16:1 ["When mandatory, the exhaustion doctrine is typically described as a jurisdictional defense, but not as implicating subject matter jurisdiction in a fundamental sense."  (Fn. omitted.)].)  Accordingly, failure to exhaust administrative remedies is generally considered an affirmative defense that is waived if not timely raised; lack of subject matter jurisdiction, in contrast, is a fundamental defect in the court's power to act and therefore can never be waived.  (See *O'Brien v. Regents of University of California* (2023)

92 Cal.App.5th 1099, 1117, fn. 4 [exhaustion defense forfeited where not raised in trial court]; *Mission Housing Development Co. v. City and County of San Francisco* (1997) 59 Cal.App.4th 55, 67.)

While Stavrinides provides many pages of case cites, he identifies no statutory provision mandating the exhaustion of any administrative remedy before the trial court could act in the instant case. (Compare *Rittiman v. Public Utilities Com.* (2022) 80 Cal.App.5th 1018, 1032 [constitutional and statutory provisions requiring petitioner to seek administrative rehearing are of true jurisdictional import]; *Shiseido Cosmetics (America) Ltd. v. Franchise Tax Bd.* (1991) 235 Cal.App.3d 478, 487–489 [statutory requirement that claim for refund be filed, enacted pursuant to Legislature's constitutionally authorized power to enact refund procedures, was fundamental jurisdictional requirement and could not be excused under any exception to the exhaustion doctrine].) Thus, even if Stavrinides had not waived the issue, he has not, in any event, shown that the trial court lacked fundamental jurisdiction to hear the instant case.

### *Appeal From Fee Order*

Stavrinides took the same approach in his appeal from the fee and cost order—that is, on June 1, 2023, he filed a "place-holder" appellant's opening brief in which he pointed to his "Second Request," asserted it was not possible to provide record citations at the time, and stated he would file a "supplemental" brief and appendix pursuant to Government Code section 68081 when he received the allegedly missing volumes of the reporter's transcript. For all the reasons we have discussed, this filing did not preserve any issue as to the fee and cost order and did not carry his burden on appeal. As we also observed, Stavrinides never sought a stipulation or filed a request for an extension of time to file his opening brief.

The county filed its respondent's brief one month later, pointing out the patent deficiencies of Stavrinides's opening brief. It also observed that the only issue Stavrinides had raised in his written opposition to the county's motion for fees and costs was that a notice of appeal from the judgment had already been filed. The county addressed that point in its reply memorandum, as did the trial court in its order. The county further pointed out in its respondent's brief that it is well established an appeal from a judgment does not divest the trial court from ruling on a post-trial motion for fees and costs. (*Korchemny v. Piterman* (2021) 68 Cal.App.5th 1032, 1052 [" 'filing of a notice of appeal does not deprive the trial court of jurisdiction to award attorney fees and costs' "].)

Three weeks later, Stavrinides filed the essentially same 31-page appellant's closing brief that he would later file in his appeal from the judgment. He rehashed his complaint about the record and then, again as best we can make out, advanced the argument administrative proceedings had not concluded and therefore the trial court lacked subject matter jurisdiction of the case. For the reasons we have discussed, we will not entertain this belated argument, and in any event, it lacks merit.

## DISPOSITION

As to defendant and appellant Sean Musgrove in appeal No. A165109, the $25,000 penalty for "indoor cultivation" is reversed and the $25,000 penalty for cannabis manufacturing is reduced to $10,000. In all other respects, the judgment against Musgrove is affirmed.

As to defendant and appellant Elias Stavrinides, the judgment in appeal No. A165109 and the fee and cost order in appeal No. A166275 are affirmed.

The parties in both appeals to bear their own costs on appeal.

_____
Banke, J.

We concur:


_____
Humes, P. J.


_____
Castro, J.*

**Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A166275, A165109, County of Sonoma v. Stavrinides